**GREATER NEW YORK HOSPITAL ASSOCIATION et al., Plaintiffs,**

**United Hospital et al., Intervenor Plaintiffs,**

**v.**

**David MATHEWS as Secretary of the United States Department of Health, Education and Welfare, and James B. Cardwell, as United States Commissioner of Social Security, Defendants.**

**No. 75 Civ. 5902 (CMM).**

United States District Court, S. D. New York.

Dec. 11, 1975.

and were granted permission to intervene in the proceedings.

All parties have now informed the court that pursuant to Fed.R.Civ.P. Rule 65(a)(2), they consent to advancing the trial of the action on the merits and consolidating it with the hearing of the application.

In order to understand fully the nature of the problem here presented, it is necessary to review the method of Medicare reimbursement in some detail.

When Medicare was first instituted in 1966, interim payment was made upon presentation of patient bills to the Medicare intermediaries (insurers in their own right who were designated by the government as its agents to approve and make Medicare payments on the local level). Within two years thereafter, huge time lags in presentation of bills and resulting payments had arisen, causing serious cash flow problems in the hospitals (called "providers" by the Medicare Act).

Proskauer, Rose, Goetz & Mendelsohn, New York City, for plaintiffs; Jacob Imberman, Susan C. Rosenfeld, Jeffrey S. Gunin, of counsel.

Hayt, Hayt, Tolmach & Landau, Great Neck, N. Y., for intervenor plaintiffs; Andrew Ross, Andrew Roth, of counsel.

Thomas J. Cahill, U. S. Atty. for the S. D. N. Y., New York City, for defendants; Frederick P. Schaffer, Taggart Adams, Asst. U. S. Attys., of counsel.

Accordingly, in 1968, in an attempt to alleviate this burden, the Commissioner instituted a Periodic Interim Payment plan (PIP). Under this arrangement, an average annual Medicare payment for each provider is determined in advance. That amount is then divided into 52 parts and paid weekly to the provider regardless of services actually performed. At the end of the year, an annual report of detailed costs is presented by the provider, and adjusted against payments made to reflect the actual Medicare reimbursement. Only 800 hospitals out of 6,700 hospitals in the Medicare program had elected to receive PIP reimbursement, when in January 1973, HEW placed a freeze on any additional PIP participants while it evaluated the system. All plaintiff hospitals are currently reimbursed by this system.

METZNER, District Judge:

The original plaintiffs, composed of the Greater New York Hospital Association (GNYHA) and Peninsula Hospital Center, on behalf of themselves and other voluntary nonprofit hospitals which are members of GNYHA, move for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. They seek to enjoin the Secretary of the Department of Health, Education and Welfare (HEW) and the Commissioner of Social Security from implementing a promulgated regulation changing the mode of reimbursement for Medicare services rendered. 20 C.F.R. § 405.454(j), 40 Fed.Reg. 29815 (July 16, 1975). After the close of the evidentiary hearing held on the motion, 25 other voluntary nonprofit hospitals applied for

It was determined in 1973 that the PIP plan paid some hospitals in advance of rendering medical care. A new Periodic Interim Payment plan was institut-

ed, providing for biweekly payments which covered estimated services rendered in the third and fourth preceding weeks (New PIP). Under PIP the average lag in payment for services rendered is 3½ days, while it is 21 days under New PIP. Providers under PIP at the time were allowed to continue under that system or transfer to New PIP. All new entrants to the system could only come in under New PIP. 600 hospitals have availed themselves of New PIP.

To sum up, the vast majority of participating hospitals are being paid under the original plan of interim payments against submission of patient bills. Somewhat less than 800 are being paid under old PIP and some 600 are being paid under New PIP.

On January 16, 1974, a Notice of Proposed Rule Making was published announcing a proposed amendment to the old PIP system whereby old PIP providers would be converted to New PIP, 39 Fed.Reg. 2011, and on July 16, 1975, the regulation was promulgated, 40 Fed.Reg. 29815, effective September 15, 1975. Through an amendment, the effective date of implementation was extended to December 1, 1975.

Under the plan of implementation, all old PIP providers were to miss the payment scheduled for December 1, 1975 and receive two weeks' payment on December 8, and thereafter biweekly. Starting with the payment of December 22, 1975, they were to receive a percentage less than the full amount so that by May 24, 1976, there would be an average 21-day lag, with bi-weekly payment.

Plaintiffs claim that the regulation was promulgated arbitrarily, capriciously, without a sufficient statement of reasons, and was an abuse of discretion on the part of the defendants. They further argue that the regulation is not in accordance with law in that it violates the Medicare Act and regulations promulgated thereunder.

Defendants contend that the regulation is not subject to judicial review and

that in any case, it is neither arbitrary nor capricious, has sufficient statement of reasons, and is in accordance with the Medicare Act and regulations.

In the instant case, 42 U.S.C. § 1395g provides in pertinent part:

"The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times *as the Secretary believes appropriate* (but not less often than monthly) . . . ." (Emphasis added.)

In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court set forth the criteria under which judicial review of agency action is proper under the Administrative Procedure Act. 5 U.S.C. § 701. The Court stated that agency action is "subject to judicial review except where there is a statutory prohibition on review or where 'agency action is committed to agency discretion by law.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 410, 91 S.Ct. at 820.

In the instant case, there is no clear and convincing showing of a legislative intent to prohibit judicial review. Accordingly, only if the agency action represented by the regulation is "committed to agency discretion by law," is review barred. This is "a very narrow exception," and is applicable "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.*

In *Overton Park*, the statute in question provided that the Secretary of the Department of Transportation shall not approve any program or project that requires the use of any public parkland, "unless (1) there is no feasible and prudent alternative to the use of such land . . . ." 23 U.S.C. § 138.

The Court rejected the argument that the words "feasible" and "prudent" gave the Secretary unfettered discretion mak-

ing judicial review impermissible under Section 701. It found that Congress, obviously, was making the preservation of parkland paramount, and that the Secretary could not approve the destruction of parkland unless he found that alternative routes presented unique problems. Thus, the Court concluded that there was "law to apply" to the Secretary's determination to take parkland, and the narrow exception of agency discretion did not exist.

Turning to the instant case, the wording of Section 1395g makes clear that the period of time within which payment is to be made is "at such time or times as the Secretary believes appropriate," but not less often than monthly. There is no dispute that the New PIP payments are to be made within the period of one month.

■ A review of the legislative history of the Act does not reveal any congressional interest in the question of payment, aside from the statutory provision that it be made at least monthly. The fixing of the payment dates within that period is committed to agency discretion by the statute and there is no "law to apply." Judicial review is barred by Section 701.

■ Plaintiffs urge that there is "law to apply" because the agency has adopted a regulation providing that "intermediaries are expected to make payments on the most expeditious basis administratively feasible." 20 C.F.R. § 405.-454(b).

It seems clear, both from testimony adduced at the evidentiary hearing and from a close study of the Medicare regulations as originally promulgated, that this regulation was adopted on November 22, 1966 in conjunction with the original form of interim payments. There is no evidence that the concept of "most expeditious payment administratively feasible" in any way was a matter of congressional intent, or anything more than what the Secretary believed to be appropriate in the case of bill submissions. Accordingly, this regulation is not a standard applicable to the regulation under attack here.

■ Finally, plaintiffs argue that the regulation was improperly promulgated because of an insufficient statement of reasons in the regulation itself. Assuming, *arguendo*, that the Secretary was required to publish reasons, whether under the APA or by undertaking to do so, and that such reasons were insufficient as published, such reasons are properly supplemented by hearing, as was done in this case. *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688 (2d Cir. 1975).

The promulgation of this regulation in July 1975 stated that "careful consideration of the introduction of an average 3-week payment lag into the PIP method demonstrated that such a lag compares favorably with the average lag in payment experienced by providers reimbursed under regular interim payment procedures." 40 Fed.Reg. 29816. This is an adequate reason for the government putting off its obligation of payment. In addition, the government's witness testified that under old PIP the weekly payments were going to the hospitals long before the latter were paying their vendors. Finally, stretching out the payments within the permissible period was accruing interest for the benefit of the Medicare fund.

Plaintiffs urge that the 17½ day extension of payment lag (from an average of 3½ days to 21 days) places undue harsh financial burdens on the presently precarious position of the objecting hospitals. Some hospitals would have to borrow money for cash flow purposes incurring the attendant interest costs. According to the statistics submitted on the hearing, the borrowing would amount to a permanent figure of nearly $30 million for all the plaintiffs. Some hospitals could not obtain additional loans for this purpose because of the existing level of their indebtedness. It appears that about one-third of the

average hospital's income is derived from Medicare payments.

I have no doubt that these facts are in the main true, but they have no bearing on the instant lawsuit. They must await determination by the government as to the amount of reimbursement that will be made to the hospitals for the added interest cost.

Similarly, the resolution of the question of whether Medicare costs will be transferred to non-Medicare patients must await the determination of the amount of reimbursement. It should be noted that the regulation under attack does not deal with this problem.

The complaint is dismissed.

So ordered.