**ST. LOUIS UNIVERSITY, etc.,**
**Appellant-Appellee,**

v.

**BLUE CROSS HOSPITAL SERVICE,**
**etc., et al., Appellees-Appellants.**

**Nos. 75–1274, 75–1293.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 12, 1976.

Decided April 12, 1976.

Rehearing and Rehearing En Banc Denied May 4, 1976.

As Modified May 10, 1976.

See also, 8 Cir., 537 F.2d 294.

Thomas V. Connelly, St. Louis, Mo., for St. Louis University, etc.; Michael B. McKinnis and Gary T. Carr, St. Louis, Mo., on the brief.

David M. Cohen, Atty., Civil Div., U. S. Dept. of Justice, Washington, D. C., for Blue Cross Hospital Service, etc., et al.; Rex E. Lee, Asst. Atty. Gen., Robert K. Kopp, Atty., Civil Div., U. S. Dept. of Justice, Washington, D. C., and Donald J. Stohr, U. S. Atty., St. Louis, Mo., on the brief.

Weissburg and Aronson, Inc., Carl Weissburg and Lyle R. Mink, Los Angeles, Cal.,

on the brief for American Hospitals, amicus curiae.

Before GIBSON, Chief Judge, CLARK, Associate Justice, Retired,* and BRIGHT, Circuit Judge.

BRIGHT, Circuit Judge.

These appeals follow an action brought by St. Louis University challenging certain HEW-mandated procedures and seeking to recover alleged overcharges repaid to HEW by appellant pursuant to an administrative determination by appellees Blue Cross Hospital Service, Inc. of St. Louis and the Blue Cross Association. The dispute arises from services rendered and payments made during appellant's fiscal year ending August 31, 1966, pursuant to the Medicare provisions of the Social Security Act of 1965.[1] In response to cross motions for summary judgment, District Judge John F. Nangle, on February 18, 1975, dismissed counts I and III of the University's complaint but granted relief on count II. The University appealed the dismissal of counts I and III and defendants cross-appealed the judgment on count II.[2]

I. *Background.*

In order to place this case in the proper perspective, the internal organization of St. Louis University must be examined. St. Louis University, as part of its program in the school of medicine, owns and operates a general hospital known as Firmin Desloge Hospital and a psychiatric unit known as the Wohl Institute. These two institutions are known as the St. Louis University Hospitals. The hospitals serve as a teaching and training facility for the school of medicine and provide medical services to both Medicare and non-Medicare patients.

---

* Associate Justice TOM C. CLARK, Retired, United States Supreme Court, sitting by designation.

1. P.L. 89–97, July 30, 1975, now codified, as amended, as Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395pp. All statutory citations are to Title 42 unless otherwise indicated.

2. The complaint contained three counts. Briefly stated, count I alleged violations of applicable statutes and regulations; count II alleged denial of procedural due process; and count III alleged denial of equal protection. For greater detail, *see* p. 287 *infra.*

Various types of medical care are provided by the hospital. The category of care involved in this case consists primarily of the services of radiologists but also include pathologists, anesthesiologists, and others. Physicians on the staff of St. Louis University who provide these services to hospital patients also perform teaching duties. In compensation for all their medical and teaching services, they receive a salary from St. Louis University.

Prior to the advent of Medicare in 1966, patients of the St. Louis University Hospital received a hospital bill which contained a single charge for this type of medical care. Taking radiology services as an example, that single charge to the patient included two unidentified components: (1) the charge for technicians, equipment, and overhead used in providing x-rays, and (2) the professional charge of the radiologist.

The Medicare program requires that these components be isolated and treated differently. The first component is termed the "provider component" and provides reimbursement for those types of services which normally are furnished by the hospital itself. This charge is covered by part A of the Medicare program. 42 U.S.C. §§ 1395c–1395i. The second is termed the "professional services component." The professional services component is insured and compensated under part B of the Medicare program. 42 U.S.C. §§ 1395j–1395w. The Medicare Act provides that the amount of reimbursement under part A (provider component) must be determined on the basis of the "reasonable cost" of such services to the provider; under part B (professional services) the basis is the "reasonable charge."

After the enactment of the Medicare Act, the St. Louis University hospitals adopted an internal accounting procedure which segregated the provider and professional services components on the hospitals' books but not on the patient's bill. Despite this new accounting procedure and even though the professional services component was no greater than the admittedly reasonable charges made by physicians in other area hospitals, the University's claim for reimbursement was disallowed to the extent that the professional services component exceeded the actual cost of the service to the hospital based on a pro rata allocation of the salary of the physicians in question. The University was required to refund to HEW all amounts received under part B which exceeded the salary amount.

Not all physicians on the teaching staff of the University hospitals bill patients through the hospitals. Teacher-physicians in certain specialties traditionally have made charges directly to the patient for their services. For example, surgeons bill the patient directly for an operation, notwithstanding that the surgeon is also a salaried member of the University's teaching staff. The surgeon's bill is paid directly to him by the Medicare carrier, and the surgeon turns the payment directly over to the University. In turn, the University pays the surgeon a salary. Where billing is done in this manner, Medicare pays the surgeon's entire bill, provided it is reasonable, even though it exceeds his salary.

In some other hospitals radiologists and related specialists customarily bill the patient directly. In those cases, Medicare pays the full reasonable charge even though it exceeds the radiologist's salary. This also is true even if the hospital does the actual billing so long as a separate charge for the physician's service (including radiological and similar services) is set out on the patient's bill and provided that this practice was followed prior to the enactment of Medicare. However, if a hospital did not identify a separate professional services component on the patient's bill prior to Medicare, it cannot obtain full reimbursement by now adopting such a procedure.[3]

Some explanation must be made of the system by which disputes with regard to

3. In this summary of the facts we describe the regulatory scheme as it has been administratively interpreted in this case, explained in the defendants' briefs, and applied to the University. Our statements here should not be taken as

Medicare payments are resolved. The Blue Cross Association (BCA) was nominated by the University Hospitals to serve as their fiscal intermediary with HEW. BCA delegated its duties as intermediary to the Blue Cross Hospital Service, Inc. (the Plan), which is a local Blue Cross group in St. Louis. Part B of the Medicare Act is administered through an insurance carrier under the part B supplemental program. That insurance carrier in this case is General American Life Insurance Company. BCA entered an agreement with the Secretary establishing a five-member Provider Appeal Committee (the Committee). The Committee was to hear appeals by providers who were dissatisfied with the reimbursement allowed by BCA. The agreement required that three of the Committee members be BCA employees—one a BCA vice-president. The other two were appointed by the BCA president from nominees of various national associations of providers. Decisions of the Committee were by majority vote. The agreement specified that decisions of the Committee would be absolutely final.[4]

The University's claim for reimbursement under part B of an amount which its internal bookkeeping identified as the charge for professional services such as those of radiologists, was accepted and paid by the insurance carrier, General American, but later, after an audit, was disallowed by the Plan. The Plan has the responsibility for auditing Medicare payments approved by the carrier. The Plan determined that the University's right to reimbursement under part B for services provided by those specialists who bill through the hospital was limited to the pro rata salary paid to those physicians.

The University appealed to the BCA Provider Appeals Committee. The Committee unanimously affirmed the Plan's decision.

When the University lost its appeal before the Committee, it brought this action in district court against BCA, the Plan, and the Secretary of HEW. As we have already noted, see note 2 supra, the complaint contained three counts. Count I alleged that the Committee's decision violated the Medicare Act and regulations promulgated thereunder. Count II alleged that the makeup of the Committee was unfair and improper and thus violated procedural due process. Count III alleged that essentially identical claims of other providers processed through a different bookkeeping procedure had been approved and paid by Blue Cross and HEW, that this distinction was not rationally related to any legitimate governmental objective, and that the University therefore had been arbitrarily and capriciously denied the equal protection of the law.

In ruling on cross-motions for summary judgment, the district court dismissed counts I and III for lack of jurisdiction due to sovereign immunity since those counts sought a money judgment, but granted the University relief on count II for denial of procedural due process. The district court determined that the Committee, consisting as it did of a majority of BCA employees, could not afford an impartial hearing to the University. By way of relief, the district court remanded the University's appeal to the Secretary for a de novo evidentiary hearing before a tribunal not containing employees of the BCA. The district court also concluded that the Medicare Act and due process required the Secretary of HEW to review the record of the hearing afforded the plaintiff, citing 42 U.S.C. § 1395h(a). We essentially affirm the district court but on different grounds.

## II. Federal Question Jurisdiction Under § 1331.

In examining our federal question jurisdiction alleged by appellant under § 1331,

---

expressing any view of the proper interpretation of the regulations.

**4.** The appointment of fiscal intermediaries is authorized by § 1395h(a). Providers have the option of not nominating an intermediary and

dealing directly with HEW. However, HEW concedes that the use of an intermediary confers significant benefits. Evidently some providers choose to forego these benefits and deal directly with HEW.

we are met with the provisions of 42 U.S.C. § 405(h). This section is part of the Social Security Act, but is incorporated "to the same extent as they are applicable" into the Medicare Act by 42 U.S.C. § 1395ii. Section 405(h) provides:

[1] The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. [2] No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. [3] No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 [§ 1331] of Title 28 to recover on any claim arising under this subchapter.

The Supreme Court in *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), discussed the jurisdictional bar imposed by this statute to parties who challenged on constitutional grounds those provisions of the Social Security Act which require that the relationship between a wage earner and his wife or stepchildren must have existed for a fixed time prior to his death as a condition for receiving benefits. The Court reached the merits only with respect to those named individual plaintiffs who had satisfied the requirements of § 405(g) which authorizes judicial review. It dismissed the class action for want of federal question jurisdiction, noting that no allegation was made that class members had exhausted their administrative remedies as required by § 405(g). *Id.* at 764, 95 S.Ct. at 2466, 45 L.Ed.2d at 538.[5]

In the course of its decision, the Court specifically examined § 405(h). The Court focused on the third sentence of § 405(h) which forbids any action "against the United States, the Secretary, or any officer and employee thereof" brought under § 41 [now § 1331] of Title 28 "to recover on any claim arising under this subchapter." The Court rejected the view expressed by many federal courts that § 405(h) merely required exhaustion of administrative remedies.[6] The *Salfi* Court said:

That the third sentence of § 405(h) is more than a codified requirement of administrative exhaustion is plain from its own language, which is sweeping and direct and which states that *no* action shall be brought under § 1331, not merely that those actions shall be brought in which administrative remedies have been exhausted. Moreover, if the third sentence is construed to be nothing more than a requirement of administrative exhaustion, it would be superfluous. This is because the first two sentences of § 405(h) * * * assure that administrative exhaustion will be required. [*Id.* at 757, 95 S.Ct. at 2463, 45 L.Ed.2d at 534 (emphasis in original) (footnote omitted).]

Appellees in *Salfi* argued that they did not seek to "recover on any claim" under the Social Security Act but rather sought to recover under the Constitution. The Supreme Court conceded this argument had some substance, *id.* at 760–62, 95 S.Ct. at 2464, 45 L.Ed.2d at 536, noting *Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). However, the Court said that it was "Social Security benefits which appellees seek to recover," *id.,* 422 U.S. at 760, 95 S.Ct. at 2464, 45 L.Ed.2d at 536, and that

[t]o contend that such an action does not arise under the act whose benefits are sought is to ignore both the language and the substance of the complaint and judgment. [*Id.* at 761, 95 S.Ct. at 2464, 45 L.Ed.2d at 536.]

Hence, the claims of the class were held to be barred by § 405(h) since, due to failure to exhaust administrative remedies, review under § 405(g) was improper. The Court said that the reach of § 405(h)

---

5. The University urges that § 405(g) was incorporated by § 1395ii. However, § 1395ii lists those specific subsections of § 405 which it intends to incorporate and § 405(g) is conspicuously omitted. Further, such a finding would

render superfluous § 1395ff(b) which authorizes some limited review and which partially incorporates § 405(g). *See* pp. 289–290 *infra.*

6. *See, e.g.,* cases cited at note 7 *infra.*

extends to any "action" seeking "to recover on any [Social Security] claim"—irrespective of whether resort to judicial processes is necessitated by discretionary decisions of the Secretary or by his non-discretionary application of allegedly unconstitutional statutory restrictions. [422 U.S. at 762, 95 S.Ct. at 2465, 45 L.Ed.2d at 536.]

The considerations which led Congress to limit review under the Social Security Act apply with equal force to the Medicare program.

The Medicare statute is a complicated one. Judicial review of the amount of all Medicare payments would bring the courts into the complex interplay between physician and hospital in ascertaining the appropriate medical charges for technical services—based on facts which vary from community to community. These charges are subject to extensive and complicated statutory guidelines and regulations. *See, e.g.,* 42 U.S.C. §§ 1395ff, 1395p, 1395u; 20 C.F.R. § 405 *et seq.* Determining the proper amount of these charges is a matter peculiarly suited to determination by a specialized agency.

■ Section 405(h) should be read with these complications in mind. We think *Salfi* requires us to follow it literally. The Supreme Court's approach to § 405(h) in *Salfi* varies substantially from the approach taken by those cases which have found jurisdiction. The citation of *Cappadora v. Celebrezze,* 356 F.2d 1 (2d Cir.1966), in Justice Brennan's dissenting opinion demonstrates

that the reasoning of those cases was considered by the Court and bolsters our conclusion that they are inconsistent with the *Salfi* decision.[7] Accordingly, we reject the authority of those pre-*Salfi* cases, relied upon by the University.[8] Since count I sought to obtain payments pursuant to the Medicare Act, § 405(h) precludes the federal courts from assuming jurisdiction under § 1331. Count III seeks similar relief and also would appear to be barred. However, it purports to raise a constitutional equal protection claim. We discuss this aspect of count III in a subsequent portion of this opinion.

### III. *Jurisdiction Under the APA.*

■ The University asserts that jurisdiction is established independently of § 1331 by the Administrative Procedure Act, 5 U.S.C. §§ 702–06. While there is some doubt whether the APA in and of itself affords an independent basis for federal court jurisdiction, in this particular case § 702 of the APA would preclude finding jurisdiction in any event. The APA provides that if agency action is "committed" to the discretion of the administrator, it is not subject to judicial review under the APA.[9] *See generally Greater New York Hospital Association v. Matthews,* 404 F.Supp. 320, 44 U.S.L.W. 2337 (S.D.N.Y. 1975).

■ To determine whether Congress intended to commit the issues raised by the University to agency discretion we must

---

7. *See id.,* 422 U.S. at 787 n. 2, 95 S.Ct. at 2477, 45 L.Ed.2d at 551 (Brennan, J., dissenting). Plaintiffs also placed heavy reliance upon *Kingsbrook Jewish Medical Center v. Richardson,* 486 F.2d 663 (2d Cir.1973), and *Aquavella v. Richardson,* 437 F.2d 397 (2d Cir.1971). These are direct offspring of the *Cappadora* decision. *Rothman v. Hospital Service,* 510 F.2d 956 (9th Cir.1975), also relies heavily on the *Cappadora* line of cases. The Fifth Circuit appears to have simply assumed jurisdiction. *Mount Sinai Hosp. v. Weinberger,* 517 F.2d 329 (5th Cir.1975), *cert. denied,* —— U.S. ——, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976).

8. We are aware that Congress has amended the Medicare Act to create a Provider Reimbursement Review Board whose decisions specifical-

ly are made judicially reviewable under the APA. 42 U.S.C. § 1395oo (1970) (Supp. III). This does not alter our view of the prior legislative intent. The amendment is applicable only to accounting periods ending on or after June 30, 1973.

9. 5 U.S.C. § 702. Of course, § 706(2)(A) authorizes a reviewing court to remedy an "abuse of discretion." Thus, all agency discretion is not insulated from judicial review. The crucial question in each case is whether the matter is sufficiently *committed* to agency discretion as to preclude review. *See* Davis, Administrative Law Treatise § 28.16 at 80–81, and 1970 Supplement § 28.16 at 964–65.

carefully examine the Medicare Act. The provision governing the availability of judicial review in this case appeared in the original Medicare Act. It provided for judicial review on behalf of an individual of

[a]ny determination [by the Secretary] * * * as to entitlement under part A or part B, or as to amount of benefits under part A * * *. [42 U.S.C. § 1395ff(b) (1970).]

The conspicuous omission of any provision for judicial review of the *amount* of benefits under part B indicates that Congress felt that determination of the proper "reasonable charge" was a matter best left to agency expertise. *Cf. Schilling v. Rogers,* 363 U.S. 666, 674, 80 S.Ct. 1288, 1294, 4 L.Ed.2d 1478, 1484 (1960).

Our view is strengthened by the emphatic language of § 405(h) which forbids bringing "any claim under § 41 of Title 28." The Supreme Court observed in *Salfi* that at the time § 405(h) was adopted

prior to the 1948 recodification of Title 28, § 41 contained all of that title's grants of jurisdiction to United States district courts, save for several [irrelevant] special-purpose * * * grants * * *. [422 U.S. at 756 n. 3, 95 S.Ct. at 2462, 45 L.Ed.2d at 534.]

Thus, by precluding any resort to § 41, § 405(h) completely eliminated all then existing jurisdictional bases for judicial review. This demonstrates a congressional intent to commit maximum discretion to the Secretary.

■ The University asserts that whatever the Secretary's discretion within statutory confines, he has so far exceeded the statute as to compel judicial intervention. We therefore turn to the statute and implementing regulations. Section 1395*l* of Title 42 authorizes reimbursement in full of the "reasonable charges" for compensable part B professional services. The implementing HEW regulations appear at 20 C.F.R. § 405.480 *et seq.* They are amplified in detail in § 3906.2 and § 3906.3 of part A,

Intermediary Manual. Section 3906.2 states in part:

Where provider has customarily identified a physician's charges separately from charges for provider services, the physician's charges so established will be considered the customary charges for his professional services, and will afford the basis for determining the reasonable charges for such services.

In contrast, § 3906.3 states in part:

Where, under an existing arrangement between a provider and physician, billings to patients have not separately identified charges of physician's services and charges for provider services a schedule charge will need to be developed based on the physician's professional component.

The Committee read these two regulations together and reached this conclusion:

These two sections, then, reiterate the two alternatives available. In effect, either the provider or physician has established the charge or they have not established a separate charge for the physician's services. If they have, that charge is the basis for Part B reimbursement for physician's services; if they have not, a charge is developed (for Medicare reimbursement purposes) based upon the physician's compensation attributable to patient care services. A separate charge has been established when the billings by the hospital have shown a separate charge for the physician's service. This charge must be separated on all billings to patients and third party payors. Only by billing all patients this separate charge can it be established as a charge for that particular service.

The University reads these regulations as interpreted by the Committee as a flat rejection of the mandatory statutory standard of "reasonable charges." *HEW,* on the other hand, asserts that these regulations do not reject the statutory standard but merely define it. Obviously, there are limits to an agency's definitional leeway.[10] How-

---

**10.** The limits of the right to define have never been exactly determined. Early sources indicate that the question is not new. Consider, for example, the following dialogue:

ever, we cannot say that the Committee's interpretation of the regulations which HEW defends in this case is so arbitrary and capricious as to compel us to intervene. The Committee's decision and the underlying regulations appear on their face to be an attempt to define the statutory language. As we hold in part IV of this opinion, it is the duty of the Secretary to review the Committee's action to assure that it comports with the Medicare Act and its implementing regulations. We cannot assume that the Secretary will so abuse the discretion conferred upon him by the Medicare Act as to place his decision outside the purview of § 405(h). Our discussion here carries no implication relating to the merits of St. Louis Hospital's claim for reimbursement.

IV. *Jurisdiction to Require Procedural Due Process (Count II).*

However, even though we conclude that Congress intended to commit the determination of the proper amount of reimbursement wholly to administrative discretion, we must still face the University's claim under count II that Congress did not and could not approve the administrative process employed in this case. The University points out that HEW subjected it to the bureaucratic whim of a nongovernmental Provider Appeals Committee, a majority of the members of which were officers or employees of BCA whose initial decision was being appealed, and who had an institutional interest in the outcome.[11] According to HEW's view, the Committee's discretion is essentially unrestrained. Judicial review is barred by § 405(h) and administrative review is precluded by the agreement between HEW and BCA which established the Committee. HEW will not review the Committee's decision even when a provider asserts that the Committee has blatantly ignored governing statutes, regulations, and constitutional requirements.

■ The Supreme Court has recognized that totally precluding judicial consideration of constitutional issues raises serious constitutional problems. *Weinberger v. Salfi, supra,* 422 U.S. at 762, 95 S.Ct. at 2465, 45 L.Ed.2d at 537; *Johnson v. Robison,* 415 U.S. 361, 366 & n. 8, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389, 397 (1974). Those constitutional problems are greatly intensified when an agency purports to subdelegate its immunity from judicial review to a nongovernmental entity. It is a "cardinal principle" that we are to ascertain whether a construction of the statute involved is "fairly possible" by which such constitutional doubts may be avoided. *Johnson v. Robison, supra,* 415 U.S. at 366–67, 94 S.Ct. at 1165–1166, 39 L.Ed.2d at 397–398. We are to proceed in what Justice Stewart termed "the candid service of avoiding a serious constitutional doubt." *United States v. Vuitch,* 402 U.S. 62, 97, 91 S.Ct. 1294, 1312, 28 L.Ed.2d 601, 624 (1971) (Stewart, J., dissenting in part).

Thus, we must now return to § 405(h) to determine if it precludes our jurisdiction to entertain a due process challenge to the procedures adopted by the Secretary to determine Medicare reimbursements. Section

---

"When I use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean—neither more or less."

"The question is," said Alice, "whether you *can* make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be master—that's all. * * * They've a temper, some of them—particularly verbs, they're the proudest—adjectives you can do anything with, but not verbs—however, *I* can manage the whole lot of them! Impenetrability! That's what *I* say!"

"Would you tell me, please," said Alice, "what that means?"

[L. Carroll, *Through the Looking Glass,* Ch. 6 (emphasis in original).]

11. The intangible effect of institutional loyalty must not be underestimated simply because it is difficult to quantify. *See* H. Simon, Administrative Behavior 13–14 (1957), *quoted in* W. Gellhorn & C. Byse, Administrative Law: Cases & Comments 881 (5th Ed. 1970). As Justice Jackson commented, "Men are more often bribed by their loyalties and ambitions than by money." *United States v. Wunderlich,* 342 U.S. 98, 103, 72 S.Ct. 154, 157, 96 L.Ed. 113 (1951). *See also Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287, 300 (1970).

405(h) forbids any action under § 1331 "to recover on any claim arising under this subchapter." Appellees in *Salfi* argued that this did not bar their constitutional claims since they "arose under" the Constitution and not under the Social Security Act. The Supreme Court recognized that this argument had substance. 422 U.S. at 760, 95 S.Ct. at 2464, 45 L.Ed.2d at 536. However, it rejected the argument because

> not only is it Social Security benefits which appellees seek to recover, but it is the Social Security Act which provides both the standing and the substantive basis for the presentation of their constitutional contentions. [*Id.* at 760–61, 95 S.Ct. at 2464, 45 L.Ed.2d at 536.]

The Court also indicated that its decision was influenced by the availability of fully adequate judicial review under § 405(g). The Court said:

> In the present case * * * the Social Security Act itself provides jurisdiction for constitutional challenges to its provisions. *Thus* the plain words of the third sentence of § 405(h) do not preclude constitutional challenges. [*Id.* at 762, 95 S.Ct. at 2465, 45 L.Ed.2d at 537 (emphasis added).]

In the present case, the due process claim has as its primary goal obtaining a constitutionally adequate hearing. Allowing such a hearing will not necessarily affect the University's entitlement to reimbursement or the amount allowed. Secondly, and more importantly, the Medicare Act does not provide the University an adequate alternative means of obtaining judicial review of its due process claim.

■ We believe that on these two grounds alone, this case is distinguishable from *Salfi*, and thus § 405(h) does not preclude our jurisdiction of count II.[12] However, there is a third basis for distinction. Section 405(h) is incorporated into the Medicare Act only "as * * * applicable."

§ 1395ii. The general rule is that a statute incorporated into another "as applicable" will be read in such a manner as will give form and effect to the statute into which it is incorporated. *Penrose v. Whitacre*, 62 Nev. 239, 147 P.2d 887, 889 (1944), and authority cited therein. If § 405(h) were read to wholly preclude adjudication of the University's due process claim it would raise serious constitutional problems which might impair the force and effect of the Medicare Act. Therefore, we find that Congress did not intend for § 405(h) to apply to the Medicare Act in such a manner as to completely bar judicial consideration of a claim of denial of due process.

On the merits of count II, the district court made the following finding:

> Three of the five Board members who conducted the subject hearing, Chairman Green, Hankle, and Moeller, were BCA employees. BCA had advised the Plan in 1969 on the merits of plaintiff's position and was supportive of the Plan's ultimate decision. Furthermore, BCA was co-contractor with the Plan in providing the intermediary services to plaintiff and the Secretary. The conclusion is inescapable that plaintiff was not afforded a hearing before an impartial decision maker.

The court also found that "both the Medicare Act, 42 U.S.C. § 1395h(a) (1965), and the constraints of due process require that the Secretary review the record of any hearing afforded plaintiff." As a remedy the court remanded the case to the Secretary "for a *de novo* evidentiary hearing before a tribunal that does not contain employees of BCA."

■ While we appreciate the district court's concern over the BCA personnel serving on the Committee, we find that the makeup of the Committee was constitutionally permissible. *See Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). Moreover, all parties to this appeal

---

12. The Supreme Court has recently found jurisdiction to review a Social Security beneficiary's claim of a denial of due process. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, 44 U.S.L.W. 4224 (U.S. Feb. 24, 1976). The Court emphasized that the due process claim was "collateral to his substantive claim of entitlement" and that no other fully effective review was available. *Id.* at 330, 96 S.Ct. at 900, 47 L.Ed.2d at 31.

seem agreed that the facts are undisputed. Thus, we cannot see that the Committee's factfinding function prejudiced the University in any way.

■ However, the parties do dispute the proper interpretation of the HEW regulations and whether these regulations are consistent with the Medicare Act. We agree with the district court that due process precluded vesting the final determination of these issues in the Committee as constituted and we doubt that Congress authorized any such delegation of power.[13]

Thus, we modify the judgment of the district court by eliminating the requirement that the Secretary hold a *de novo* evidentiary hearing. While on remand the Secretary may hold such an evidentiary hearing if it is thought desirable, we direct only that the Secretary adopt and employ appropriate measures to determine the University's contentions concerning the proper interpretation of the Medicare Act and regulations.

V. *Jurisdiction to Require Equal Protection (Count III).*

Finally, we must consider count III in which the University advances an equal protection claim. The University asserts that the Committee acted arbitrarily and capriciously by disallowing its claim while allowing identical claims of other providers similarly situated who merely happen to have a different bookkeeping system.

On its face this appears to raise a constitutional issue.[14] The Due Process Clause of the fifth amendment has been held to embody a guaranty of equal protection by the

federal government. *See United States Dept. of Agriculture v. Moreno,* 413 U.S. 528, 533 n. 5, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782, 787 (1973). Traditionally, equal protection analysis has required that a governmental classification be "rationally related to a legitimate governmental objective." *Id.* at 533, 93 S.Ct. at 2825, 37 L.Ed.2d at 787.

Much of our jurisdictional analysis of the procedural due process issue presented in count II would seem to support our jurisdiction of count III, which also arises under the due process guaranty of the fifth amendment. If § 405(h) bars our jurisdiction, the University will have no judicial forum in which to assert its constitutional right to equal protection.

On the other hand, the direct purpose of this claim is to increase the amount of reimbursement to the University. Thus, it appears to fall squarely within the language of § 405(h) and of the Supreme Court in *Salfi.* 422 U.S. at 760–62, 95 S.Ct. at 2464–2465, 45 L.Ed.2d at 536–537. Additionally, count III seeks a money judgment against the United States. The doctrine of sovereign immunity probably would permit the Congress to forbid such an action even if based upon a constitutional violation. *See Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15, 23 (1963); *cf. Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

We need not reach this difficult issue at this time. Pursuant to count II, we have determined that this case should be remanded to the Secretary for his considera-

---

**13.** Section 1395h(a) authorizes the Secretary to enter into an agreement with [a fiscal intermediary like BCA] providing for the determination by such agency or organization (*subject to* the provisions of section 1878 [42 U.S.C. § 1395oo] and to *such review by the Secretary as may be provided for by the agreement*) of the amount of the payments required * * *. (Emphasis supplied). HEW reads the language included in parenthesis to allow the Secretary to enter an agreement which precludes any administrative review whatsoever of a fiscal intermediary's determination. However, this takes the paren-

thetical too far. The statute may well permit an agreement authorizing a properly constituted intermediary to make final factual determinations. However, the general scheme of the statute requires that the Secretary retain sufficient powers of review to assure that fiscal intermediaries comply with the HEW regulations and the Medicare Act.

**14.** The University's complaint in this case is at least somewhat more specific than the conclusory allegations in *Schilling v. Rogers,* 363 U.S. 666, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960), that the administrative action was "arbitrary and capricious."

tion of the University's position. Consideration of the issues raised in count III must await the Secretary's hearing and decision on the University's claim.[15]

Postponing a decision on count III offers several advantages. In count I, the University has argued that under the proper interpretation of HEW's regulations, it is entitled to full reimbursement. The Secretary may agree. If so, a judicial resolution of the difficult issues presented by count III will be unnecessary. On the other hand, if the Secretary rejects the University's claim, the count III jurisdictional issue will be squarely presented. Should jurisdiction be found, judicial assessment of the merits of the claim will be made substantially easier by the Secretary's authoritative construction of the regulations and articulation of their underlying rationale.

Therefore, we make the following disposition of this appeal:

1) The district court's dismissal of count I for lack of jurisdiction is affirmed for the reasons discussed above;

2) The district court's judgment granting relief on count II is modified by eliminating the requirement of a *de novo* evidentiary hearing before a tribunal that does not include members of BCA, but is affirmed to the extent that it requires the Secretary to make a final administrative determination of the medical fee dispute between appellant and appellees.

3) The district court's dismissal of count III is affirmed on the ground that it is premature but without prejudice to a later action raising the equal protection clause.

---

**15.** As noted in our discussion of count II, the extent of Congress' power to preclude judicial consideration of constitutional issues is itself a difficult constitutional question which has never been clearly resolved by the Supreme Court. It is the settled federal practice to postpone resolving such constitutional issues until a decision is necessary. *Sullivan v. Meade County School Dist. 101,* 530 F.2d 799, 44 U.S.L.W. 2424 (8th Cir.1976).