**CHELSEA COMMUNITY HOSPITAL, SNF, and Chelsea Community Hospital, a Michigan nonprofit Corporation, Plaintiffs,**

v.

**MICHIGAN BLUE CROSS ASSOCIATION, Blue Cross Association and F. David Matthew, Secretary of Health, Education and Welfare, Defendants.**

Civ. A. No. 75–71379.

United States District Court, E. D. Michigan, S. D.

June 3, 1977.

Gilbert M. Frimet, Alan G. Gilchrist, Frimet, Goren, & Bellamy, Southfield, Mich., William J. Rademacher, Chelsea, Mich., for plaintiffs.

William Z. Elliott, Civil Division, Dept. of Justice, Washington, D.C., Thomas M. Woods, Asst. U. S. Atty., Detroit, Mich., for defendants.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

CORNELIA G. KENNEDY, District Judge.

In this action plaintiffs, providers of services furnished to patients covered by the Health Insurance for the Aged Act (Medicare), 42 U.S.C. § 1395, et seq., seek judicial review of defendants' decision disallowing as reimbursable costs the rental payments during the period 1970 through 1972, made by the providers to their lessor, and substituting the lessor's costs of ownership. The plaintiffs, Chelsea Community Hospital, SNF (a skilled nursing facility) and Chelsea Community Hospital are closely related non-profit organizations operating a nursing home and hospital, respectively, in Chelsea, Michigan. The nursing home and hospital were constructed by a Michigan co-partnership, Chelsea Medical Center, on land purchased by it for this purpose. On June 22, 1970, the partnership signed a lease agreement with plaintiff Chelsea Community Hospital, SNF, which in turn entered into a sublease agreement with plaintiff Chelsea Community Hospital on September 29, 1970. The sublease incorporated the basic terms of the lease. Thereafter, the lease was amended retroactively to January 1, 1970, to substitute a fixed rental payment per bed for the previous sliding scale based on actual occupancy; this change was made on the advice of the Internal Revenue Service in order to permit the plaintiffs to qualify for tax-exempt status under § 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).

Under the Medicare Act periodic payments to providers of services to insured patients may be made either directly by the Secretary of Health, Education and Welfare or through a "fiscal intermediary"—a public or private organization which has contracted with the Secretary to determine the proper amount of payments and to make such payments. Each provider of services may elect to be reimbursed either by such an intermediary or by the Secretary himself. 42 U.S.C. §§ 1395g and 1395h. In the instant case, plaintiffs nominated defendant Blue Cross Association (BCA) to serve as such a fiscal intermediary; BCA had previously entered into an agreement with the Secretary to perform such a function. BCA and defendant Michigan Blue Cross Association (MBCA) were parties to an agreement under which MBCA undertook to perform audits of various providers and determine the amount of payments to be made, with actual payment being made by BCA with funds advanced by the Secretary. MBCA began such an audit of plaintiffs in the spring of 1972 (the actual audits were conducted by employees of Blue Cross of Illinois, apparently on "loan" to MBCA).

42 U.S.C. § 1395x(v)(1)(A) provides in part as follows:

> The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or

methods to be used, and the items to be included, in determining such costs . . .

The amount paid to a provider is the lesser of "reasonable cost" so defined and the customary charges for such services. 42 U.S.C. § 1395f(b)(1). Pursuant to statutory authority, the Secretary has established an extensive code of regulations, including the following:

(a) *Principal.* Costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.

(b) *Definitions*—(1) *Related to provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

(2) *Common ownership.* Common ownership exists when an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

(3) *Control.* Control exists where an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

(c) *Application.* (1) Individuals and organizations associate with others for various reasons and by various means. Some deem it appropriate to do so to assure a steady flow of supplies or services, to reduce competition, to gain a tax advantage, to extend influence, and for other reasons. These goals may be accomplished by means of ownership or control, by financial assistance, by management assistance, and other ways.

(2) Where the provider obtains items of services, facilities, or supplies from an organization, even though it is a separate legal entity, and the organization is owned or controlled by the owner(s) of the provider, in effect the items are obtained from itself. An example would be a corporation building a hospital or a nursing home and then leasing it to another corporation controlled by the owner. Therefore, reimbursable cost should include the costs for these items at the cost to the supplying organization. However, if the price in the open market for comparable services, facilities, or supplies is lower than the cost to the supplier, the allowable cost to the provider shall not exceed the market price.

20 C.F.R. § 405.427(a)(b)(c).

During the course of the aforementioned audit, the auditors determined that one Dr. Michael Papo, the principal partner of Chelsea Medical Center (the lessor), was also the medical director and administrator of both providers (lessee and sublessee). Dr. Papo owned a ⅔ interest in the partnership in 1970 (minor interests totalling 7% were later transferred by him to a relative and to his wife as trustee for his children). Administrative Record, Tab A, exhibit F. The auditors also found that Dr. Papo had signed promissory notes on behalf of plaintiff Chelsea Community Hospital, SNF (also known as Chelsea Medical Center, Inc.); had underwritten and guaranteed loans to both providers, pledging his own household goods as collateral; had paid property taxes for the providers (and was later reimbursed by the plaintiff nursing facility); had guaranteed a lease agreement between one of the providers and a third party; and, had, check-writing authority for both providers.

On the basis of these and other factors, MBCA determined that Dr. Papo was "in a position to have influence and enjoy effective control of the affairs of these providers regardless of his title." Administrative Record, Tab A, exhibit C. It, therefore, concluded that the lessor-partnership and the lessee-providers were related by common control, and that rental payments under the building lease were includable as allowable costs of the providers only to the extent of the lessor's costs of ownership. Accordingly, plaintiffs' rental costs were re-

determined on this basis and allowed in an amount $202,152 less than that provided in the lease agreement. BCA payments to plaintiffs were adjusted to reflect this change.

In November of 1972, Dr. Papo resigned his position as Medical Director of both providers. Beginning with the calendar year 1973, therefore, defendants have found that the providers and the lessor-partnership were not related organizations, and have allowed the full amount of rental payments made by the providers as reimbursable costs.

On April 6, 1973, plaintiffs requested a provider appeal hearing of MBCA's determination as to rental payments during 1970–1972, in accordance with a procedure adopted by BCA to comply with 20 C.F.R. § 405.1809. The hearing was held on February 19, 1975, before a hearing officer of BCA. The hearing officer issued a written decision, finding that the facts determined by MBCA's auditors were basically correct; that these facts established a "presumption" of common control; that the providers had failed to rebut this "presumption"; and that the reduction in costs allowed was, therefore, proper. No statute or regulation provides for review by the Secretary of a fiscal intermediary's determination of reasonable cost for accounting periods prior to 1973.

Plaintiffs filed the instant case on July 23, 1975. Their complaint based the Court's jurisdiction on 28 U.S.C. § 1331 and the Administrative Procedure Act, 5 U.S.C. § 702, and set forth five separate "counts," including Count Three—Failure to Render a Decision Supported by Substantive Evidence. Plaintiffs filed an amended complaint, adding 42 U.S.C. § 405(g) and (h) as bases of jurisdiction, and adding a claim that the hearing officer's decision was "arbitrary," "capricious" and an "abuse of discretion" within the meaning of 5 U.S.C. § 706. The record of the administrative hearing has been filed, including a transcript, an extensive brief, and several exhibits. Plaintiffs have filed a motion for summary judgment, and defendants have filed a motion to dismiss or, in the alternative, motion for summary judgment. Both motions were argued by counsel at a hearing held on February 28, 1977, after which the Court took them under advisement. Defendants have filed a post-hearing brief in support of their motion, and plaintiffs have submitted a response to that brief.

## JURISDICTION TO REVIEW BCA'S DECISION

■ Defendants' motion to dismiss raises the fundamental issue of whether this Court has jurisdiction to consider plaintiffs' claims. As noted above, plaintiffs have alleged jurisdiction under several statutes, including 28 U.S.C. § 1331. However, 42 U.S.C. § 405(h) provides in part that

> No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 to recover on any claim arising under this subchapter.

The Supreme Court has recently interpreted this statute as an absolute bar to actions based on 28 U.S.C. § 1331[1] against the Secretary of Health, Education and Welfare (HEW) for disability insurance benefits under the Social Security Act. *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). Section 405(h) was made applicable to the Medicare Act by 42 U.S.C. § 1395ii:

> The provisions of sections 406 and 416(j) of this title, and of subsections (a), (d), (e), (f), (h), (i), (j), (k), and (*l*) of section 405 of this title, shall also apply with respect to this subchapter to the same extent as they are applicable with respect to subchapter II of this chapter.

Accordingly, the *Salfi* decision applies to the instant case and bars the exercise of jurisdiction under the general federal question statute.

---

**1.** The Supreme Court explained that at the time § 405(h) was enacted, 28 U.S.C. § 41 comprised virtually all of the jurisdictional grants contained in Title 28, including the general federal question jurisdiction now codified as 28 U.S.C. § 1331.

Plaintiffs have cited many cases following *Aquavella v. Richardson*, 437 F.2d 397 (2d Cir. 1971), in which the Second Circuit held that 28 U.S.C. § 1331 did provide jurisdiction in a Medicare case. All of these cases were apparently decided prior to the *Salfi* decision, however, except one: *Humana of South Carolina, Inc. v. Mathews*, 419 F.Supp. 253 (D.D.C. 1976). The opinion in that case seems to focus on the first sentence of § 405(h): "The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing." Since there is no provision of the Medicare Act requiring the Secretary to hold a hearing on the "reasonable cost" of services for which providers are to be reimbursed,[2] the opinion concludes that § 405(h) is inapplicable in such cases. A very similar argument was rejected by the Supreme Court in *Salfi*, 422 U.S. at 756–59, 95 S.Ct. 2457. This reasoning largely overlooks the third sentence of § 405(h) which states flatly that "No action . . . shall be brought under [§ 1331] to recover on any claim arising under this subchapter." *Salfi* makes it clear that a claim for the "reasonable cost" of providers' services to Medicare patients "arises under" the Medicare Act. The Eighth Circuit has explicitly rejected the contention that § 405(h) has limited applicability to the Medicare Act, stating: "We think *Salfi* requires us to follow [§ 405(h)] literally." *St. Louis University v. Blue Cross Hospital Service*, 537 F.2d 283 (8th Cir.), *cert. denied,* 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976).

Moreover, the Supreme Court implicitly rejected the *Humana* rationale in the recent case of *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). In that case plaintiff, an applicant for disability insurance benefits whose claim had been finally rejected almost seven years earlier, sought to file a second claim alleging the same bases for disability. An administrative law judge treated this as a request to reopen the claimant's prior application, and denied the request. Plaintiff sought judicial review of the refusal to reopen, basing jurisdiction on 42 U.S.C. § 405(g), rather than § 1331. The District Court dismissed the action for want of jurisdiction and the Seventh Circuit reversed, holding that jurisdiction was conferred by § 10 of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* The Supreme Court reversed, holding that § 405(g) did not apply and that the Administrative Procedure Act was not an independent grant of jurisdiction to federal courts. Since § 405(g) did not apply, the *Humana* decision would have led to the conclusion that § 405(h) did not bar review pursuant to 28 U.S.C. § 1331. The Supreme Court's failure to find jurisdiction on this basis reflects its view that § 405(h) has a broader scope than the *Humana* decision indicates. This view is clearly shown by the opinion of Justice Stewart, who concurred in the Court's judgment on the ground that § 405(h) barred judicial review regardless of

---

**2.** It should be noted, however, that the Medicare Act does provide for review by the Secretary (and subsequent judicial review) of certain other determinations, such as whether an individual is covered by the Act, 42 U.S.C. § 1395ff(b)(1), and whether an institution or agency is or is not a "provider of services," 42 U.S.C. § 1395ff(c). The presence of such explicit statutory authority for administrative and judicial review of particular determinations reinforces the conclusion that Congress did not intend to permit judicial review of "reasonable cost" determinations for periods prior to 1973. This intention is made explicit in the legislative history of the Medicare Act: "It is intended that the remedies provided by these review procedures shall be exclusive." Senate Report No. 404, 89th Congress, 1st Session, 54–55; 1965 U.S.Code Cong. & Admin.News, p. 1995.

On October 30, 1972, the Act was amended by Public Law 92–603, 86 Stat. 1420, establishing "Provider Reimbursement Review Board" under the Secretary to review disputes between providers and fiscal intermediaries as to the amount of reimbursement due, and related issues. 42 U.S.C. § 1395*oo*. Subsection (f) of this section originally provided for judicial review only in the event that the Secretary reversed or modified the Board's decision; a 1974 amendment expanded (f) to permit judicial review of any final decision of the Board, as well as any reversal, modification, or affirmance by the Secretary. Public Law 93–484; 88 Stat. 1459. These amendments were, however, made applicable only to cost reports of providers of services for accounting periods ending on or after June 30, 1973. Pub.L. 92–603 § 243(c); Pub.L. 93–484 § 3(b).

whether the APA would otherwise provide jurisdiction.

■ Alternatively, plaintiffs assert that the Court has jurisdiction of this action pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* In *Sanders, supra,* the Supreme Court noted that on October 21, 1976, Congress had enacted an amendment to 28 U.S.C. § 1331(a), eliminating the ten thousand dollar amount-in-controversy requirement as to any action "brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity." The Court then concluded that "this amendment largely undercuts the rationale for interpreting the APA as an independent jurisdictional provision," (430 U.S. at 105, 97 S.Ct. at 984) and held that the APA did not confer jurisdiction on the district court to consider the action. This rationale admits no meaningful distinction of the instant case.

■ Finally, plaintiffs urge that jurisdiction over this action may be founded on 42 U.S.C. § 405(g) and (h). Clearly, § 405(h) only limits, and does not confer jurisdiction. While it is doubtful that there has been any "final decision of the Secretary made after a hearing" in this case to which § 405(g) might be applied, *cf. Sanders, supra,* § 405(g) simply does not apply to actions based on the Medicare Act.

Accordingly, the Court concludes that it has no jurisdiction to review the decision of the BCA hearing officer that plaintiffs and their lessor, Chelsea Medical Center, were organizations related by common control until 1973.

## JURISDICTION TO DECIDE CONSTITUTIONAL ISSUES

■ In his decision the hearing officer expressly abstained from responding to plaintiffs' constitutional challenges to the statute and the regulations, ruling that such issues were beyond the scope of his authority. Plaintiffs have renewed these constitutional claims in their complaint; if such claims cannot be considered by this Court plaintiffs will be left with no forum,

judicial or administrative, in which to seek redress for what they contend are constitutional deprivations. Such a result would certainly be extraordinary, and statutes should not be construed to create such a situation in the absence of "clear and convincing evidence" that this was the intent of Congress. *Johnson v. Robison,* 415 U.S. 361, 373, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *see also Sanders, supra,* 430 U.S. at 109, 97 S.Ct. 980. Moreover, such a construction would raise a serious constitutional question as to the validity of the statute involved, since it is not clear that Congress has the power to totally preclude judicial review of constitutional issues. See *St. Joseph Stock Yards Co. v. United States,* 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033 (1936); H. HARE & H. WECHSLER, THE FEDERAL COURTS AND THE FEDERAL SYSTEM.

Although such a profound and sensitive question should certainly be avoided wherever possible, the Court's prior determination that § 405(h) precludes judicial review of the hearing officer's decision might also be considered applicable to plaintiffs' constitutional issues, which the hearing officer declined to consider. The Eighth Circuit confronted this issue in *St. Louis University, supra.* After distinguishing *Salfi* on the ground that the Medicare Act does not provide an alternative means for obtaining judicial review of constitutional claims, the Eighth Circuit noted that § 1395ii incorporated the provisions of § 405(h) into the Medicare Act only "as . . . applicable," and concluded that Congress did not intend that § 405(h) would preclude due process challenges to the Medicare Act.

■ While this Court might well be inclined to adopt this reasoning, there is no need to decide the question in the instant case. Since the Court is of the opinion that plaintiffs' constitutional claims are without merit, it may be assumed *arguendo* that jurisdiction exists to decide these claims despite § 405(h). This does not violate the principle of avoiding decision of constitutional issues wherever possible, since a contrary assumption would present the Court

with the far more difficult constitutional question of Congress' power to preclude such review.

## PROCEDURAL DUE PROCESS

Plaintiffs' constitutional claims may be conveniently divided into those based on alleged "procedural" violations of due process and those based on "substantive" violations. The procedural claims are set forth in the first two counts of the complaint. The first such claim appears in ¶ 38:

Plaintiff believes and, therefore, avers that subsequent to the hearing of February 18, 1975 the hearing officer, Mr. James Gaynor, consulted with Blue Cross Association representatives and/or Blue Cross of Michigan representatives concerning this case without likewise consulting Plaintiffs pursuant to Blue Cross Association procedures attached hereto as Exhibit B despite Plaintiffs' objections to the same.

Defendants' response to this claim is contained in paragraph 4 of the affidavit of James M. Gaynor, the BCA Chief Hearing Officer who conducted the provider appeal hearing requested by plaintiffs:

Mr. John P. Ruocco, an employee of BCA and an accountant with expertise in the area of health care reimbursement and in the Medicare principles of reimbursement and Mr. Henry Revzan a member of the staff of the Legal and Corporate Division attended the hearing as advisors to the affiant. Mr. Ruocco was available to serve as a reimbursement advisor to the hearing officer if such were necessary. Mr. Revzan's primary function at the hearing was to aid the hearing officer by attending to such ministerial duties as marking exhibits in proper sequence to assure an orderly entry of such materials into the record. The affiant may have consulted with either Mr. Revzan or Mr. Ruocco concerning the decision but in so doing he was merely discussing his decision with his staff. Neither Mr. Revzan nor Mr. Ruocco had any prior involvement in

or responsibility for reimbursement decision which was under appeal. In addition, neither Mr. Revzan nor Mr. Ruocco had any responsibility for BCA's administration of the Medicare Program, other than the appeals process.

Paragraph 5 of this affidavit adds that "there were no communications between the hearing officer or his staff and Blue Cross and Blue Shield of Michigan personnel subsequent to the hearing."

■ Plaintiffs' claim of improper *ex parte* contact between the hearing officer and BCA officials is nowhere explained beyond the vague statements in the complaint. In administrative hearings, it is usually the case that the decisionmaker is an employee of the same agency whose initial decision—made by a co-employee—is under review. The fact that such a decisionmaker may discuss aspects of the case with other agency employees certainly does not violate due process if these employees were not involved in the initial decision. The Gaynor affidavit is uncontradicted, and establishes that those persons with whom the hearing officer discussed the case after the hearing had no more interest or involvement in MBCA's initial decision than did the hearing officer himself. Moreover, plaintiffs do not claim that the allegedly improper contacts related to any disputed fact. Some *ex parte* contact is almost inevitable in any adversary hearing; such contacts do not violate due process in the absence of any claim of prejudice.

■ In paragraphs 45 and 46 of their complaint, plaintiffs allege that they demanded discovery from BCA prior to the hearing, but that discovery was denied by BCA employees other than the hearing officer. The administrative record includes a "Request for Pre-hearing Discovery" dated April 6, 1973, and a reply letter from J. D. Epstein, Associate Counsel of BCA, dated April 23, 1973. Administrative Record, Tab A, Exhibits A & B. The Epstein letter granted plaintiffs access to all evidence used by MBCA in making its initial deter-

mination; all audit work papers; the prime contract between BCA and HEW; the subcontract between BCA and MBCA; and all published decisions of the BCA Provider Appeals Committee. The only major aspect of discovery that was denied was the right to depose seven individual employees. Regulations in effect at this time (37 F.R. 10724, May 27, 1972) provided that prehearing discovery "shall be permitted upon timely request," referring to audit work-papers and other documents; there is no mention of depositions. In the Court's opinion, due process in the context of provider appeal hearings does not require that providers be permitted to depose individual employees of the fiscal intermediary or HEW. Moreover, several of the individuals plaintiffs sought to depose were present at the hearing, but were not extensively questioned; nor have plaintiffs sought to depose these persons in this civil action pursuant to Rule 30, F.R.Civ.P. Thus, the refusal to permit prehearing depositions does not appear to have prejudiced plaintiffs' appeal.

Plaintiffs final "procedural" claim is set forth in Count Two of the complaint:

50. By delegating the final decision of the adjudication of a dispute between a provider and a fiscal intermediary to a hearing officer and employee of BCA as hereinabove described, while failing to provide an impartial review of such adjudication by a governmental agency charged with the administration of the Medicare program, the Secretary has abused his discretion and has made an unlawful delegation of authority which operated to deny Plaintiffs due process of law.

The uncontested *Gaynor* affidavit states that the hearing officer was an attorney in BCA's legal department who "had no prior involvement in any aspect of the reimbursement dispute which gave rise to the Provider's appeal"; that no member of BCA's legal department had any responsibility for the administration of the Medicare program, other than appeals; that the hearing officer's decision was based solely on the record developed at the hearing and a post-

hearing brief submitted by the Providers; and that BCA "had no pecuniary interest in the outcome of the appeal hearing as it is reimbursed directly by the Secretary . . . for any funds paid to providers."

■ The short answer to plaintiffs' claim of improper delegation of authority is that plaintiffs themselves chose to be reimbursed through BCA as fiscal intermediary, rather than to deal directly with the Secretary, and they cannot now complain, therefore, that the Secretary refuses to become involved in the appeal process.

Section 1395h permits a provider of services to deal directly with the Secretary of Health, Education, and Welfare. . . The plaintiffs cannot be heard to complain about their own choice.

*Schroeder Nursing Care, Inc. v. Mutual of Omaha Ins. Co.*, 311 F.Supp. 405, 411 (E.D. Wis.1970) (citation omitted).

Plaintiffs have cited *St. Louis University, supra,* in support of their claim of improper delegation. In that case, the provider appeal hearing had been conducted by a five-member panel, three of whom were BCA employees. The district court concluded that the provider had not been afforded a hearing before an impartial decision maker, and remanded the case to the Secretary " 'for a *de novo* evidentiary hearing before a tribunal that does not contain employees of BCA.' " 537 F.2d at 292. On appeal the Eighth Circuit panel quoted 42 U.S.C. § 1395h(a), which authorizes the Secretary to

enter into an agreement with [a fiscal intermediary] providing for the determination by such agency or organization (*subject to* the provisions of section 1878 [42 U.S.C. § 1395oo] and to *such review by the Secretary as may be provided for by the agreement*) of the amount of the payments required . . . . .

(Emphasis added.) Disagreeing with HEW's contention that this language allowed the Secretary to enter into an agreement providing no agency review whatsoever of a fiscal intermediary's determination, the panel concluded that "the general

scheme of the statute requires that the Secretary retain sufficient powers of review to assure that fiscal intermediaries comply with the HEW regulations and the Medicare Act."

 The complaint in the instant case does not allege that the HEW regulations applied by defendants are inconsistent with the Medicare Act; plaintiffs' claim, rather, is that these regulations as applied violate substantive constitutional rights (discussed below). Since claims based directly on the Constitution are generally considered to be beyond the competence of administrative agencies, as well as "subcontractors," such as BCA, no purpose would be served by requiring the Secretary to provide an administrative review of plaintiffs' constitutional claims. Since no statutory claim is included in plaintiffs' complaint in this case, the Court need not decide whether it would follow the Eighth Circuit's decision that HEW must review a provider's statutory appeals.

 Insofar as the Eighth Circuit's decision applies also to contentions that fiscal intermediaries have misinterpreted regulations, this Court is constrained to disagree. As HEW argued in *St. Louis University,* the language of 42 U.S.C. § 1395h(a), read literally, permits the Secretary to enter agreements with fiscal intermediaries providing for no review by HEW of intermediaries' final decisions. This interpretation is at least consistent with the legislative history and the scheme of the Act. Section 1395h includes no explicit requirement that the Secretary retain the power to review intermediaries' decisions, either at the behest of disappointed providers or on a *sua sponte* basis to protect the public fisc; instead, it provides that the Secretary may terminate an agreement with a fiscal intermediary if he finds that the intermediary "has failed substantially to carry out the agreement." 42 U.S.C. § 1395h(e)(2)(A). The existence of this alternative "remedy" (clumsy though it may be) argues against the assumption that the Act requires the Secretary to retain review power over individual determinations.

 Closely related to the claim of improper delegation of authority is plaintiffs' contention that the hearing officer was inherently biased because he was an employee of BCA. This contention is explained in plaintiffs' brief at 9–10:

. . . the similar interest of minimizing cost under Blue Cross Association's private insurance contracts and the Medicare statute presents such an identity of interest so as to render a fair hearing impossible. Under the Medicare statute, a hospital is to be reimbursed on the basis of reasonable cost. The same standards apply to reimbursements under the private insurance contracts, Blue Cross Association and Michigan Blue Cross-Blue Shield. Blue Cross Association is dependent upon Michigan Blue Cross-Blue Shield and other local "plans" for financial support. It is somewhat disingenuous on the part of the Government to suggest that the private insurance companies can sit in judgment of reasonable costs under the administration of the Medicare Program without any consideration of the impact of such decisions upon claims of hospitals for reimbursement for reasonable costs under their private insurance contracts.

The mere fact that BCA may have an interest in minimizing the amount of "reasonable costs" paid for Medicare services, independent of the Act itself, does not mean that it will be biased to unfairly compensate providers. As plaintiffs themselves characterize it, BCA's interest in minimizing the costs of its private insurance plans is "similar" to the public interest expressed in the "reasonable costs" provision of the Medicare Act. The rates for insurance provided by MBCA are so highly regulated by the State of Michigan that the extent of MBCA's financial interest in reducing costs is rather speculative. Neither BCA, as a private insurer, nor the Secretary, as administrator of the Medicare Act, has any interest in reimbursing providers of services so inadequately as to drive them out of the business of providing such services. Thus, while BCA may indeed have a "similar"

interest, plaintiffs have not alleged that BCA has or had any conflicting interest that might have led it to unfairly judge the issues presented at their provider appeal hearing. Accordingly, the fact that the hearing officer was an employee of BCA did not deprive plaintiffs of the due process of law guaranteed by the Fifth Amendment. *St. Louis University, supra; cf. Hortonville Joint School District No. 1 v. Hortonville Education Assn.,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976) and *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

Finally, it should be noted that the government did not appeal from the order of remand in *St. Louis University* and, therefore, HEW is currently establishing procedures to provide for the Secretary's review of fiscal intermediaries' decisions in provider reimbursement disputes. *See* Affidavit of Alvin D. Diamond. Defendants' post-hearing brief urges that plaintiffs' claims of improper delegation and bias of the hearing officer are moot. The procedure has not yet been established, however, and it is not entirely clear that it will cover the dispute in the instant case.

## SUBSTANTIVE DUE PROCESS

Plaintiffs' substantive due process claims are set forth in Counts IV and V of their complaint. Count IV alleges that the hearing officer's interpretations of the regulations concerning common control were "utterly without reason" and that as so construed the regulations violate plaintiffs' right to equal protection of the laws, one of the substantive rights guaranteed by the Fifth Amendment's Due Process Clause. *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

■ In their briefs, plaintiffs urge that the hearing officer held that common control could be found on the basis that Dr. Papo (who admittedly owned a ⅔ interest of the lessor-partnership) could effectively control plaintiffs, the non-profit providers, by "force of his personality." As plaintiffs contend, such a standard would be extremely vague at best. However, the hearing officer's decision actually stated as follows:

> The question is whether, by force of his personality or by virtue of the accumulated debts of a monetary and a personal nature owed to him, was he able to effectively control the provider.

Complaint, exhibit A, p. 6. The record is undisputed that Dr. Papo did guarantee substantial loans to the providers, pledging his personal belongings as security. The standard applied by the hearing officer was not, therefore, unconstitutionally vague.

■ Plaintiffs also point out that the hearing officer held that MBCA's findings established a "presumption" that Dr. Papo had the power to influence or direct the actions of the providers; plaintiffs' brief appears to argue that this presumption is an irrebuttable one. Plaintiffs' Memorandum of Law at 25–26. This creates some confusion with plaintiffs' further contention that the related organizations principle contained in the regulation embodies an unconstitutional "irrebuttable presumption." Plaintiffs' Memorandum at 47. The Court, however, understands the hearing officer's decision as stating only that the facts advanced by MBCA sufficed to create a *prima facie* showing of common control which plaintiffs failed to refute. Accordingly, the hearing officer's decision was based on no "irrebuttable presumption" different from that contained in the regulation itself.

Since the regulation provides that "control" exists "where an individual has the power, directly or indirectly, significantly to influence or direct the actions or policies of" a provider, regardless of whether such control was actually exercised, plaintiffs contend that it creates an "irrebuttable presumption" that a control person has exercised his control to inflate the price a provider has agreed to pay for services, facilities or supplies furnished by a related organization.

The analytical basis for the doctrine that "irrebuttable" or "conclusive" presumptions are unconstitutional was thoroughly dis-

cussed and justifiably criticized in Note: *The Conclusive Presumption Doctrine: Equal Process or Due Protection?*, 72 Mich. L.Rev. 800 (1974). Plaintiffs have cited several several cases relying on this doctrine, all predating the aforementioned note: *U. S. Dept. of Agriculture v. Murry*, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973); *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1971); and *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). In more recent cases, the conclusive presumption doctrine has either been ignored or distinguished on questionable grounds. See *Knebel v. Hein*, 429 U.S. 288, 97 S.Ct. 549, 50 L.Ed.2d 485 (1977); *Weinberger v. Salfi, supra*, 422 U.S. at 753 and 802–805, 95 S.Ct. 2457; *Sosna v. Iowa*, 419 U.S. 393, 405–410, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); and *United States v. Friday*, 404 F.Supp. 1343 (E.D.Mich. 1975); *but cf. Turner v. Dept. of Employment Security*, 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975). Moreover, as the aforementioned note observes, most of the cases in which the Supreme Court has applied the doctrine have involved situations of particular hardships on individuals; the doctrine appears to have acted as a "hardship exception" to the result that would otherwise be reached by the application of established equal protection analysis. 72 Mich.L.Rev. at 830. The instant case involving payments under a sophisticated lease of real estate between a partnership and a corporation, simply does not fit this mold.

■ *Weinberger v. Salfi, supra,* concerned a constitutional challenge to a provision of the Social Security Act which defined "widow" and "child" so as to exclude from coverage surviving wives and stepchildren who had established their relationships to the deceased wage earner less than nine months before his death. Plaintiff contended this statute irrebuttably presumed that marriages which occurred within the nine months preceding a wage earner's death were entered into for the purpose of securing Social Security benefits. The Supreme Court rejected this claim after an extensive discussion. The Court first indicated that no "property" interest implicating the due process clause was involved:

> Unlike the claims involved in *Stanley* and *LaFleur* [*Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed. 2d 52 (1974)], a noncontractual claim to receive funds from the public treasury enjoys no constitutionally protected status. . . . [A]ppellees are completely free to present evidence that they meet the specified requirements; failing in this effort, their only constitutional claim is that the test they meet is not so rationally related to a legitimate legislative objective that it can be used to deprive them of benefits available to those who do satisfy that test.

422 U.S. at 771–772, 95 S.Ct. at 2470. The Court then turned its attention to the particular "presumption" challenged:

> Commercial insurance policies have traditionally relied upon fixed, prophylactic rules to protect against abuses which could expand liability beyond the risks which are within the general concept of its coverage. . . . While such a limitation doubtless proves in particular cases to be "under-inclusive" or "over-inclusive," in light of its presumed purpose, it is nonetheless a widely accepted response to legitimate interests in administrative economy and certainty of coverage for those who meet its terms. When the Government chooses to follow this tradition in its own social insurance programs, it does not come up against a constitutional stone wall. Rather, it may rely on such rules so long as they comport with the standards of legislative reasonableness enunciated in cases like *Dandridge v. Williams* [397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491] and *Richardson v. Belcher* [404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231].
>
> Under those standards, the question raised is not whether a statutory provision precisely filters out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. . . . The question is

whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule. 422 U.S. at 776–777, 95 S.Ct. at 2472–73.

The "control" regulation at issue in the instant case creates a similar prophylactic rule, justified by the expense and difficulty that would result from attempts to determine whether control actually was exercised in individual cases. There can be no doubt that this rule is rationally related to the legitimate governmental goal of minimizing the cost of services provided under the Medicare Act. *Schroeder Nursing Care, Inc., supra,* 311 F.Supp. at 411. Accordingly, the regulation defining "control," 20 C.F.R. § 405.427, is not unconstitutional as applied in this case.

■ Plaintiffs' memorandum raises two similar challenges to the constitutionality of the regulations. First, it is asserted that the Internal Revenue Service's decision to grant a § 501(c)(3) tax exemption to the providers conclusively established that the lease agreement involved in this case provided a rental payment that was "fair." Although the hearing officer implied that the Service's standard might differ from the "reasonable cost" standard under Medicare, it may be assumed that plaintiffs' contention is correct. Nevertheless, in light of the Court's decision that the related organization regulation is constitutional, the fact that the rental payment may have been fair and reasonable is no more relevant to the amount of reimbursement due than was the fact that the plaintiff's marriage to the decedent in *Salfi* may have been entered into without consideration of the impending death and resultant Social Security benefits.

■ Plaintiffs' second related claim is based on 20 C.F.R. § 405.427(d), an exception to the related organization principle:

*Exception.* An exception is provided to this general principle if the provider demonstrates by convincing evidence to the satisfaction of the fiscal intermediary (or, where the provider has not nominated a fiscal intermediary, the Social Security Administration), that the supplying organization is a *bona fide* separate organization; that a substantial part of its business activity of the type carried on with the provider is transacted with others than the provider and organizations related to the supplier by common ownership or control and there is an open, competitive market for the type of services, facilities, or supplies furnished by the organization; that the services, facilities, or supplies are those which commonly are obtained by institutions such as the provider from other organizations and are not a basic element of patient care ordinarily furnished directly to patients by such institutions; and that the charge to the provider is in line with the charge for such services, facilities, or supplies in the open market and no more than the charge made under comparable circumstances to others by the organization for such services, facilities, or supplies shall be allowable as cost. [31 F.R. 14815, Nov. 22, 1966].

Section 1012 of the Bureau of Health Insurance Health Manual, interpreting this regulation, states as follows:

Exception provided in Section 1010 is not applicable to rental of hospital facilities and nursing homes or extended care facilities. The rental of such facilities would not meet the requirement that there be an open competitive market for the facility furnished. The exception contemplates quantities of goods or services made available to the general public, part of which would be the provider.

Plaintiffs claim that this directive (which it merely assumes was applied in this case) treats lease agreements differently from other contracts between "suppliers" and "providers," and operates as an "irrebuttable presumption" that a person with the power to control a provider has in fact

exercised that power whenever the provider enters a lease agreement with a related organization. For the reasons previously stated, it is clear that the claimed irrebuttable presumption does not render the regulation unconstitutional, either on its face or as applied in this case. The distinction between lease agreements and other supplier agreements is clearly compelled by the regulation itself in the instant case; since the partnership only leased its facilities to the plaintiffs-providers, both of whom were related to it by common control, there was no "open, competitive market" for those facilities as required to qualify under § 405.-427(d). The requirement that a provider demonstrate the existence of such a market to qualify for the exception to the related organization principle is clearly related to the legitimate purposes of the Medicare Act.

 Count V of the complaint sets forth plaintiffs' final constitutional claim:

That the refusal of HEW to provide any kind of standards at the inception of this lease agreement, coupled with the subsequent refusal of the hearing officer to follow previously published decisions, amounts to a retroactive application of the hearing officer's personal interpretation of related organizations in violation of Plaintiffs' due process rights.

The alleged refusal to provide standards refers to an exchange of letters between an accounting firm acting for plaintiffs and Alan M. May, Assistant to the Secretary. Mr. May's letter, dated March 13, 1970, informs the firm that "[t]he Administration does not customarily render advance opinions concerning the acceptability of contemplated financial arrangements." Exhibit D to the Complaint. However, the letter goes on to observe that "[t]he relationship between the Chelsea Medical Center and the operating corporation would have to be very carefully examined to determine whether or not the regulation concerning 'related organizations' would apply," and then quotes part of the regulation referring to the power of an individual significantly to control the policies of an organization. Considering the fact that Mr. May presuma-

bly knew nothing about Dr. Papo himself or the control structure of either the partnership or the providers, it is hard to imagine how he could have better explained the standard at issue in this case. In any event, plaintiffs cite no authority for the proposition that an administrative agency must render advisory opinions on request, and the Court is aware of none. *Cf. Helco Products v. McNutt,* 78 U.S.App.D.C. 71, 137 F.2d 681 (1943). Certainly such opinions are not required by the constitutional guarantee of due process.

 The allegation that the hearing officer refused to follow "previously published decisions" is based primarily on Provider Appeal Decision BCA No. 00–27, the facts of which are set forth in plaintiffs' memorandum at 27. In the instant case, the hearing officer noted the plaintiffs' argument that this decision should control the case, but did not explicitly state why he disagreed with that contention. The failure to distinguish prior published opinions does not, however, amount to a deprivation of due process. An administrative hearing officer is not required to distinguish prior published administrative decisions any more than this Court is required to distinguish *St. Louis University* or *Schroeder Nursing Care, Inc., supra.* Plaintiffs have cited *U.A.W. v. N.L.R.B.,* 148 U.S.App.D.C. 305, 459 F.2d 1329 (1972), where the court stated:

It is an elementary tenet of administrative law that an agency must either conform to its own precedents or explain its departure from them.

459 F.2d at 1341.

Even assuming that tenets of administrative law are guaranteed by the due process clause, the "tenet" referred to concerns *general rules of law* previously adopted by administrative agencies, rather than particular adjudications reached in prior situations with rather similar factual circumstances. *U.A.W. v. N.L.R.B.,* for instance, involved an unexplained departure by the Labor Board from its longstanding policy of utilizing the "adverse inference rule" of

evidence. The issue whether Dr. Papo had the power "significantly to influence or direct the actions or policies of" the providers, on the other hand, is essentially factual.

Moreover, the prior decision cited by plaintiffs is readily distinguishable from the instant case. The facts in the prior decision did not reveal any guarantees of loans or any comparable involvement by the medical director in the financial affairs of the provider beyond the fact that he was one of five trustees. Dr. Papo's guarantees of loans to the providers in the instant case created a significantly different factual situation from that leading to the "no control" finding in BCA No. 00–27.

For all of the foregoing reasons, the Court is of the opinion that the defendants' actions in this case did not deprive plaintiffs of any constitutional right, and that it does not have jurisdiction to review the plaintiffs' claims that BCA's decision was unsupported by substantial evidence or otherwise in violation of the Administrative Procedure Act. Accordingly, plaintiffs' motion for summary judgment IS DENIED; defendants' motion for summary judgment IS GRANTED; and a judgment DISMISSING THIS ACTION will be entered.

IT IS SO ORDERED.