Dr. Walter A. CERVONI, Plaintiff,
Appellant,

v.

SECRETARY OF HEALTH, EDUCA-
TION AND WELFARE,
Defendants, Appellees.

No. 77–1345.

United States Court of Appeals,
First Circuit.

Argued Feb. 13, 1978.

Decided June 27, 1978.

Juan F. Esteves, San Juan, P. R., with whom Pieras & Esteves, San Juan, P. R., was on brief, for plaintiff-appellant.

William Kanter, Atty., App. Section, Civ. Div., Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Washington D. C., Julio Morales Sanchez, U. S. Atty., San Juan, P. R., and Mary Gallagher, Atty., App. Section, Civ. Div., Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before COFFIN, Chief Judge, MOORE * and CAMPBELL, Circuit Judges.

MOORE, Circuit Judge:

Walter A. Cervoni, M.D., brought this action seeking judicial review of an administrative determination by the Secretary of Health, Education and Welfare (the "Secretary") of his claim that his services, as a hospital-based physician and as director of two clinical pathology laboratories, be reimbursed under Part B of the Medicare Act, 42 U.S.C. §§ 1395j–1395w, for physicians' services, rather than under Part A of the Medicare Act, 42 U.S.C. §§ 1395c–1395i, for hospital services. The district court ruled that it possessed no subject matter jurisdiction based on any of the statutory grounds alleged, and, after a hearing on the question of the existence of a substantial constitutional question, determined that no constitutional issue was presented since appellant had not been deprived of any property interest. From this determination of lack of jurisdiction, Dr. Cervoni appeals.

* Of the Second Circuit, sitting by designation.

## I. BACKGROUND OF MEDICARE

In order to understand this case, some insight into, and understanding of, the intricate provisions of the statute is necessary. Congress enacted Federal Health Insurance for the Aged, popularly known as "Medicare", as part of the Social Security Act of 1965.[1] The Medicare program consists of two basic, substantively distinct parts—Part A providing insurance for hospital and hospital-related services, 42 U.S.C. §§ 1395c–1395i, and Part B, providing supplementary medical services, primarily in the form of physicians' services, 42 U.S.C. §§ 1395j–1395w.[2]

Under Part A, insured persons aged 65 or over receive "basic protection against the costs of hospital and related post hospital services . . . .". § 1395c. The beneficiaries of the services do not pay hospitals directly. Instead, fees for hospital services are paid directly by the government, from the Federal Hospital Insurance Trust Fund, § 1395i, which is financed by wage taxes on employers and self-employers. The hospital and other "providers"[3] are reimbursed by the Secretary through "fiscal intermediaries". These intermediaries are private nongovernment entities, such as health and accident insurance companies (including "Blue Cross" organizations) nominated by a provider or group of providers. § 1395h. The fiscal intermediaries perform various functions as agents for HEW, such as hospital audits, information dissemination, and final disbursement.

The rate of reimbursement to providers is the lesser of "(A) the reasonable cost of such services or (B) the customary charges with respect to such services . . . ." § 1395f(b)(1). Services that are reimbursed include inpatient hospital services, which are bed and board, nursing services, use of hospital facilities, and "such other diagnostic or therapeutic items or services, fur-

nished by the hospital or by others . . . ." § 1395x(b). *See* 20 C.F.R. 405.116(a). These services do not include "medical or surgical services provided by a physician, resident, or intern . . . ." § 1395x(b)(4).

Under Part B, §§ 1395j–1395w, persons aged 65 or older, § 1395o, are eligible to enroll in the program to obtain benefits, § 1395p, by agreeing to pay monthly premiums which are established by the Secretary. §§ 1395r(b) and (c). These premiums, and contributions from the federal government, are deposited into the Federal Supplementary Medical Insurance Trust Fund, which is distinct from the fund established for Part A. § 1395t. Money from this fund is used to pay the benefits provided by Part B, §§ 1395*l*(a) and 1395t(g). The rate of reimbursement is 80% of the reasonable charge, § 1395*l*(a)(1), except for services of radiologists and pathologists to inpatients, for which there is 100% reimbursement, § 1395*l*(a)(1)(B). An individual covered under Part B can either pay for the services received and request reimbursement, § 1395u(b)(3)(B)(i) or can assign the right to reimbursement to the person providing the services, who can collect as assignee of the beneficiary. § 1395u(b)(3)(B)(ii). The services covered include "medical and other health services", including physicians', diagnostic, home health, and outpatient physical therapy services. §§ 1395k and 1395x(s).

Part B is administered through intermediaries called "carriers", whose role is comparable to that of the "intermediaries" under Part A. § 1395u.

## II. FACTS

Benefit payments for physicians' services to individual patients generally are furnished under the voluntary supplementary medical insurance of Part B.

---

1. P.L. 89–97 §§ 101–122, 79 Stat. 286, July 30, 1965, codified, as amended, as 42 U.S.C. §§ 1395–1395pp.

2. Hereinafter references to the Medicare Act will list only the applicable section of Title 42 of the United States Code.

3. "The term 'provider of services' means a hospital, skilled nursing facility, or home health agency . . . ." § 1395x(u).

§ 1395k(a)(2)(B)(i). Payments for services provided by hospitals are furnished under Part A. § 1395d. Appellant Dr. Cervoni is a physician and a pathologist. Dr. Cervoni was under contract with two small private hospitals, Doctor's Hospital, in Santurce, Puerto Rico, and Auxilio Mutuo Hospital ("Mutuo") in Rio Piedras, Puerto Rico. Dr. Cervoni contends that, contrary to the opinion of the Secretary, Dr. Cervoni's professional services should be reimbursed under Part B of Medicare, not under Part A. The appellant asserts that the actions of the Secretary created "a *suspension* of payments under Part B and a *disentitlement* of plaintiff's rights under the Act." (emphasis in original). Appellant's Br. at 3. Jurisdiction was asserted under 28 U.S.C. § 1331(a); under the Medicare provisions of the Social Security Act, 42 U.S.C. § 1395 *et seq.;* under the Fifth and Fourteenth Amendments; under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06; under 42 U.S.C. § 1983; and under 28 U.S.C. § 1361.

Dr. Cervoni's contract with Doctor's Hospital, included in the complaint, provided that appellant would "carry out the duties of director of the Clinical Laboratory Department of The Hospital", App. 19, and would "receive as compensation for his professional services 30 per cent of the net profits produced by the laboratory." App. 22. This contract (entered in 1961) and the contract with Mutuo pre-dated the hospitals' becoming, in 1966, participating providers under Medicare.

Until 1972, Dr. Cervoni was permitted to bill his services under Part B. On September 15, 1972, the Secretary sent a letter to Seguros de Servicio de Salud ("SSS"), the Part B carrier. App. 56. The letter advised SSS that the Secretary had asked the Part A intermediary, then Medicare Part A of Puerto Rico, to develop, pursuant to 20 C.F.R. 405.487(b), the proper allocation of

Dr. Cervoni's services into Part A and Part B services. The Secretary indicated that "[i]nformation available makes us strongly believe that an overpayment will be incurred to this doctor" and asked SSS "to stop all payments effective upon receipt of this letter to [Dr. Cervoni] until we inform you that this matter has been finally resolved." App. 56. On September 19, 1972 the Secretary notified Dr. Cervoni that payments to him under Part B had been stopped.[4]

After a lethargic period of investigation, the hospital intermediary, then Cooperativa de Seguros de Vida de Puerto Rico ("Cooperativa"), notified Dr. Cervoni on June 18, 1974:

[C]linical laboratory services are considered hospital services for medicare reimbursement purposes. Since no direct physician services to a patient are involved, there is no professional component to reimburse. This means that you can no longer receive reimbursement through the Part B carrier. App. 65.

Cooperativa suggested that "[i]f you consider that you will not be receiving reimbursement for services rendered to medicare patients you should discuss with the provider a new agreement to include in your compensation the services rendered to medicare patients." App. 65. In this way Dr. Cervoni would receive compensation directly through the provider hospitals.

With regard to Mutuo, Dr. Cervoni was allowed to keep any Part B payments made to him through June 30, 1973. Since July 1, 1973, Dr. Cervoni has received a salary through this hospital, and Mutuo has received payments through Part A. With regard to Doctor's Hospital, Dr. Cervoni received Part B payments through September 15, 1972. Since that time he has been reimbursed by the hospital at an annual rate of $20,237, which is included in the

4. Prior to these letters, SSS had written Dr. Cervoni as early as October 1, 1969, to inform him that his services were properly reimbursable under Part A, not Part B. Subsequently, on several different occasions, including February 3, 1972 and September 13, 1972, representatives of HEW and the Part A intermediary met

with Dr. Cervoni to discuss the propriety of payments to Dr. Cervoni under Part B. As a result of these discussions, letters, and telephone calls, the Secretary halted the Part B payments. Affidavit of Joseph Godfrey, Appellee's Ex. B.

hospital cost reports and reimbursed by the intermediary.

Dr. Cervoni's controversy with HEW arose from the difficulty of determining reimbursement for services performed by hospital-based physicians, a problem addressed by the Medicare regulations in 20 C.F.R. 405.480–405.488.[5] The problem is not uncommon because many hospitals employ pathologists and other physicians:

> The functions of these physicians vary widely. In some cases they devote full time to education or administration. Conversely, some are exclusively concerned with patient care. Any one of these physicians may be engaged in a variety of activities including teaching, research, administration, supervision of professional or technical personnel, service on hospital committees, and other hospital-wide activities, as well as direct personal health services to individual patients. . . . 20 C.F.R. 405.480(e).

These physicians generally are compensated by the hospital through some combination of either salary or a percent of gross or net income received from patients for the particular services. 20 C.F.R. 405.480(f). Regardless of the remuneration arrangement between the physician and the hospital and regardless of whether the physician's services are billed separately from the hospital charges, the Medicare provisions distinguish between "medical and surgical services" and "hospital services". As stated by the regulations:

> This is required because the payments will come from different trust funds, the payments will usually be handled by different intermediaries, and the methods of determining the two payments will differ materially. Thus, there are two sources of payment under the health insurance program for services furnished to beneficiaries under title XVIII of the Act [Medicare]. . . . 20 C.F.R. 405.-480(g).

Physicians' services to patients may be reimbursed only through Part B. 20 C.F.R. 405.482. A physician's service is defined as "an identifiable service requiring performance by a physician in person, which contributes to the diagnosis of the condition of the patient . . . or contributes to the treatment of such patient." 20 C.F.R. 405.-483(a).

The hospital and physician may reasonably allocate the portion of the physician's compensation which will be attributed to the care of individual patients and the portion which will be attributed to service to the institution. 20 C.F.R. 405.484(a) and 405.487(b)(1). If a dispute arises as to the proper allocation of compensation to the physician, "[t]he fiscal intermediary responsible for hospital cost reimbursement and the carrier responsible for payments under the supplementary medical insurance program will resolve the issue by negotiation if possible, otherwise by time studies or other suitable methods." 20 C.F.R. 405.487(b)(3). If a physician disputes such a determination, the statute does not provide for additional administrative or judicial review.

Dr. Cervoni contends that under the current method of payment, he will receive less money than he would receive under Part B, but the government contends that he will receive at least as much if not more through Part A reimbursement. He asks damages for money unlawfully retained by the Secretary and a determination that his services contain a professional component reimbursable under Part B.

## III.  DISCUSSION

The focal question is whether the district court was correct in dismissing Dr. Cervoni's claim for want of jurisdiction.

5. These sections

> "deal principally with the identification of the source and amount of benefit payments under the program for services performed by physicians (other than interns and residents) in a hospital setting under circumstances where physicians typically are salaried or receive compensation from or through the hospital under arrangements such that the physician is paid an agreed amount or the hospital remits to him an agreed portion of the collections from patients in its own right or as agent for the physician. . . ." 20 C.F.R. 405.480(c).

**(A)** *Administrative Procedure Act ("APA")*

■ The Supreme Court held in *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) that "the APA is not to be interpreted as an implied grant of subject-matter jurisdiction to review agency actions." *Id.* at 105, 97 S.Ct. at 984. Thus, the APA does not provide basis for subject matter jurisdiction for this case.

**(B)** *Medicare Act, 42 U.S.C. § 1395 et seq.*

The Medicare Act provides for judicial review only in certain enumerated circumstances. Judicial review is provided for controversies involving Medicare providers, 42 U.S.C. § 1395*oo*(f), but appellant is not a provider as defined in the Act. 42 U.S.C. § 1395x(u).[6]

Any institution or agency is also entitled to a hearing and to judicial review under § 405(g), if it is dissatisfied "with any determination by the Secretary that it is not a provider of services, or with any determination described in section 1395cc(b)(2) [relating to termination of provider status] . . . ." 42 U.S.C. § 1395ff(c).

The Act does not provide judicial review for determinations of benefits under Part B. However, when payment on a claim under Part B is denied, the beneficiary (patient) has a right to an "informal review determination", which is conducted by the carrier. § 1395u(b)(3)(C); 20 C.F.R. 405.801(a) and 405.807–405.812. The beneficiary may seek review of that decision at a hearing also conducted by the carrier. 20 C.F.R. 405.820–405.835. A physician, as assignee of the beneficiary, has the same right to review as the beneficiary. 20 C.F.R. 405.801(a).

■ An individual may obtain an administrative hearing and judicial review (pursuant to § 405(g)) regarding his eligibility for medical eligibility or enrollment under Part B, and determinations of benefits under Part A. § 1395ff(b)(1). The Act does not explicitly provide for review of a physician's claims in general, nor does it provide for review of a determination whether a particular physician's services should be classified as Part B services.

**(C)** *28 U.S.C. § 1331*

**(i)** *The import of 205(h) of the Social Security Act*

Dr. Cervoni attempts to invoke jurisdiction based on the general federal question jurisdiction of 28 U.S.C. § 1331. However, § 205(h) of the Social Security Act, 42 U.S.C. § 405(h), incorporated into the Medicare Act by 42 U.S.C. § 1395ii, provides:

The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No finding of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 to recover on any claim arising under this subchapter.

The Supreme Court in *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), held that § 405(h) provided an absolute jurisdictional bar to parties who challenged "duration-of-relationship Social Security eligibility requirements for surviving wives and stepchildren of deceased wage earners". 422 U.S. at 752–53, 95 S.Ct. at 2461. The Court stated:

That the third sentence of § 405(h) is more than a codified requirement of administrative exhaustion is plain from its own language, which is sweeping and direct and which states that *no* action shall be brought under § 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted. (emphasis in original). 422 U.S. at 757, 95 S.Ct. at 2463.

The Eighth Circuit has interpreted *Salfi* to preclude review of the amount of Medicare payments. *St. Louis University v. Blue Cross Hospital Service,* 537 F.2d 283 (8th Cir. 1976). The court held that "by

---

**6.** *See* n.3, *supra.*

precluding any resort to § 41 [§ 1331], § 405(h) completely eliminated all then existing jurisdictional bases for judicial review. This demonstrates a congressional intent to commit maximum discretion to the Secretary." *Id.* at 290. The court noted:

> The Medicare statute is a complicated one. Judicial review of the amount of all Medicare payments would bring the courts into the complex interplay between physician and hospital in ascertaining the appropriate medical charges for technical services—based on facts which vary from community to community. These charges are subject to extensive and complicated statutory guidelines and regulations. *See, e. g.,* 42 U.S.C. §§ 1395ff, 1395p, 1395u; 20 C.F.R. 405 *et seq.* Determining the proper amount of these charges is a matter peculiarly suited to determination by a specialized agency. *Id.* at 289.

Other Circuit Courts addressing the issue of § 1331 jurisdiction have held that *Salfi* forecloses jurisdiction under § 1331 in reimbursement actions emanating from the Medicare Act, notwithstanding a constitutional attack. However, the courts in each of these cases have found that alternative means were available to the complaining parties so that the courts were not entirely closed to constitutional challenges. *See, e. g., Association of American Medical Colleges v. Califano,* 186 U.S.App.D.C. 270, 277–279, 569 F.2d 101, 108–10 (1977) (review available under 42 U.S.C. § 1395oo, but plaintiffs failed to exhaust administrative remedies); *Dr. John T. MacDonald Foundation, Inc. v. Califano,* 571 F.2d 328 (5th Cir. 1978) (en banc) (case transferred to the Court of Claims pursuant to 28 U.S.C. § 1406(c)); *South Windsor Convalescent Home, Inc. v. Mathews,* 541 F.2d 910 (2d Cir. 1976) (jurisdiction in the Court of Claims under 28 U.S.C. § 1491). Several courts after *Salfi,* but before *Sanders,*

found that § 1331 jurisdiction was precluded but that jurisdiction was available under the APA. *See, e. g., Adams Nursing Home of Williamstown, Inc. v. Mathews,* 548 F.2d 1077 (1st Cir. 1977); *Hazelwood Chronic & Convalescent Hospital, Inc. v. Weinberger,* 543 F.2d 703, 705 (9th Cir. 1976), *vacated for reconsideration in light of Califano v. Sanders,* 430 U.S. 952, 97 S.Ct. 1595, 51 L.Ed.2d 801 (1977); *Gallo v. Mathews,* 538 F.2d 1148 (5th Cir. 1976).

In *Salfi* the appellants argued that their claim arose under the Constitution since they were constitutionally challenging a portion of the Social Security Act, and jurisdiction should attach under 28 U.S.C. § 1331. However, the Court rejected this argument, finding that § 405(h) extended "to any 'action' seeking 'to recover on any [Social Security] claim'—irrespective of whether resort to judicial processes is necessitated by discretionary decisions of the Secretary or by his non-discretionary application of allegedly unconstitutional statutory restrictions." 422 U.S. at 762, 95 S.Ct. at 2465.

In the ordinary case, as in *Salfi,* the Social Security Act itself provides jurisdiction for constitutional challenges to its restrictions. Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), authorizes a civil action to be commenced within 60 days of the mailing of HEW's notice of a final decision after a hearing. However, § 405(g) was not incorporated into the Medicare Act.[7] Since Dr. Cervoni's claim is not included in any of the explicit review provisions of the Medicare Act and § 405(g) is not applicable, no procedures are explicitly provided for a constitutional attack on the statute. However, an interpretation of *Salfi* which prevented all judicial review of constitutional claims under the statute, "might lead to a constitutional question of the first order, one that has arisen but rarely and tangentially in our constitutional

---

**7.** Section 1395ii conspicuously omits § 405(g) from the list of the subsections of § 405 which it intends to incorporate:

> The provisions . . . of subsections (a), (d), (e), (f), (h), (i), (j), (k) and (*l*) of section 405 of this title, shall also apply with respect to this subchapter to the same extent as they are applicable with respect to subchapter II of this chapter. 42 U.S.C. § 1395ii.

history, i. e., whether the Congress can close the federal courts entirely to constitutional challenges directed against federal statutes or action." (footnotes omitted). *South Windsor Convalescent Home, Inc. v. Mathews, supra,* 541 F.2d at 913. *See, e. g., Sheldon v. Sill,* 49 U.S. (8 How.) 441, 12 L.Ed. 1147 (1850); *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1872). *See* Hart, *"The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic,"* 66 Harv.L.Rev. 1362 (1953). In *Salfi* the Court was aware of this problem and distinguished *Johnson v. Robinson,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), where the Court found jurisdiction to review the constitutionality of veteran's legislation, because in the absence of jurisdiction, "no judicial consideration of the issue would be available." 422 U.S. at 762, 95 S.Ct. at 2465.

Here Dr. Cervoni does not challenge the validity of any portion of the Medicare Act or the applicable regulations. Thus, we need not determine the hypothetical question whether jurisdiction would attach to hear a constitutional challenge to the statute when judicial review is not otherwise available. Dr. Cervoni does challenge the application of the statute and regulations to him, to reach a decision about the statute's application contending that the procedures used did not comport with due process. But if his claim is colorable, jurisdiction might nonetheless lie under § 1331. That issue brings us to the fourth alleged basis of jurisdiction.

### (ii) *Constitutional Issues*

The district court ruled correctly that it lacked jurisdiction unless Dr. Cervoni had raised colorable constitutional claims. The court then conducted a hearing to determine whether any such claims did exist.

The Supreme Court's determination in *Salfi,* that § 405(h) precludes judicial review of a constitutional challenge to the validity of the statute in question, might also be read to have precluded consideration of all constitutional issues. As stated in Section C, *supra,* such an interpretation would raise serious constitutional questions. In any event, *Salfi* need not be read so broadly. The Court in *Sanders, supra,* noted that "when constitutional questions are in issue, the availability of judicial review is presumed, and we will not read a statutory scheme to take the 'extraordinary' step of foreclosing jurisdiction unless Congress' intent to do so is manifested by 'clear and convincing' evidence." 430 U.S. at 109, 97 S.Ct. at 986 (citing *Salfi* and *Johnson* ). *See Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

The Eighth Circuit, in *St. Louis University, supra,* held that § 405(h) does not preclude review of a due process challenge to the procedures adopted by the Secretary to determine Medicare reimbursements. The court based its jurisdiction on three grounds: (1) "[T]he due process claim has as its primary goal obtaining a constitutionally adequate hearing. Allowing such a hearing will not necessarily affect the University's entitlement to reimbursement or the amount allowed"; (2) The Medicare Act did not provide the plaintiff hospital an "adequate alternative means of obtaining judicial review of its due process claim"; and (3) Section 405(h) was incorporated into the Medicare Act only "as . . . applicable", § 1395ii, which may be interpreted as Congress' not intending completely to bar judicial consideration of a claim of denial of due process. 554 F.2d at 717.

■ There is no need to decide the question whether § 405(h) should be read as a bar to constitutional claims involving due process in the instant case. Here the district court properly determined, after a hearing, that no constitutional issue was raised. Dr. Cervoni contends that he has been denied a basic property interest and should be afforded proper procedural avenues to pursue his claim. Procedural due process is not invoked by every government action adversely affecting private interests. Instead, procedural due process safeguards apply only when a person is deprived "of life, liberty, or property, without due process of law . . . ." U.S.Const., Amend. V.

■ The definition of protected property rights has been expanded in recent years from earlier common law notions of real or personal "property". In establishing guidelines for determining the existence of a property interest in continued public employment, the Supreme Court stated:

> To have a property interest in a benefit, a person must have more than abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>
> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

For example, in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court held that New York could not terminate public assistance payments to a particular person without an evidentiary hearing. The Court stated:

> It may be realistic today to regard welfare entitlements as more like 'property' than a "gratuity". Much of the existing wealth in this country takes the form of rights that do not fall within the traditional common-law concepts of property. *Id.* at 262 n.8, 90 S.Ct. at 1017.

In order to constitute a property right, one must have a current valid expectation, based on the Government's implied promise to continue an entitlement, in an important, personal, monetizable interest.

The classification scheme involved here does not affect interests that properly may be classified as property within the meaning of the Fifth Amendment. The result of the determination by the Secretary is to prohibit Dr. Cervoni from being reimbursed under Part B of Medicare. Instead, the hospitals with which he is associated will be able to collect, through Part A of Medicare, for his services. If Dr. Cervoni is not satisfied with the compensation he receives in turn from the hospitals, he can re-negotiate his contracts or seek a salary (as he now receives) from the hospitals for the services for which he received Part B payments in the past.

The Medicare Part B program is nothing more than a governmental insurance program for the aged. As such the real parties in interest are the beneficiaries; physicians are parties in interest only as assignees of the beneficiaries. Unlike the welfare benefits of *Goldberg v. Kelly,* which were "a matter of statutory entitlement for persons qualified to receive them", 397 U.S. at 262, 90 S.Ct. at 1017, physicians do not have a protectable property interest in their continuing eligibility to bill for reimbursement under Part B. If services rendered by a physician are disentitled from Part B eligibility, the physician can either not perform the services or bill the patient directly.

■ The Government has not promised, explicitly or implicitly, that the program under Part B will continue. Dr. Cervoni's contracts with the hospitals were entered into well before the advent of Medicare, and at the time he could not expect his services to be paid by Medicare. The mere fact that, at the start of Medicare, Dr. Cervoni was paid under Part B did not create a valid expectation that he could continue to be reimbursed under Part B. Since reimbursement through Part B was a creature of the Medicare statute and regulations, the regulations and interpretations of them could be expected to be modified by Congress or by HEW. As stated by the Supreme Court:

> To engraft upon the Social Security system a concept of "accrued property rights" would deprive it of the flexibility and boldness in adjustment to ever-

changing conditions which it demands. It was doubtless out of an awareness of the need for such flexibility that Congress included in the original Act, and has since retained, a clause expressly reserving to it "[t]he right to alter, amend, or repeal any provision" of the Act. § 1104, 49 Stat. 648, 42 U.S.C. § 1304. (citation omitted) *Flemming v. Nestor,* 363 U.S. 603, 610–11, 80 S.Ct. 1367, 1372–74, 4 L.Ed.2d 1435 (1960).

An interpretation of valid regulations, classifying services into one of two categories for payment from participation trust funds, does not implicate property rights where none existed before.

This general determination of the proper classification of services does not affect specific bills which Dr. Cervoni may submit for payment. If in the future Dr. Cervoni makes a claim for payment under Part B, as found by the district court, "should said claim be denied or not acted upon expeditiously, plaintiff would have a right to the review proceedings established in 20 C.F.R. 405.801 *et seq.* The same would hold true with respect to a disagreement over the amount of payment." (App. 223).[8] Since Dr. Cervoni possessed no protectable property interest, the Secretary was not required to give him a hearing before making the classification. Appellant therefore has made out no colorable due process claim such as would support federal jurisdiction under § 1331.

(D) *Other Bases for Jurisdiction*

■ Dr. Cervoni urges two other bases for jurisdiction—specifically 42 U.S.C. § 1983 and 28 U.S.C. § 1361. First, 42 U.S.C. § 1983 is not a jurisdictional grant.

Second, neither § 1983 nor its jurisdictional counterpart, 28 U.S.C. § 1343(3), constitutes an applicable basis for jurisdiction since they do not concern actions against federal officers. *See Soldevilla v. Secretary of Agriculture,* 512 F.2d 427, 429 (1st Cir. 1975).

■ Likewise, mandamus jurisdiction does not attach under 28 U.S.C. § 1361. Substantial questions exist after *Salfi* regarding the extent to which § 405(h) bars mandamus jurisdiction. *See Association of American Medical Colleges v. Califano, supra* 186 U.S.App.D.C. at 279–283, 569 F.2d at 110–14; *White v. Mathews,* 559 F.2d 852, 856 (2d Cir. 1977); *Hazelwood Chronic & Convalescent Home, supra,* 543 F.2d at 706 n.5. However, even if jurisdiction is proper, mandamus is not a proper remedy in this case.

Mandamus may properly issue when three elements are present:

> (1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and preemptory duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available. *Lovallo v. Froehlke,* 468 F.2d 340, 343 (2d Cir. 1972).

*See United States ex rel. Girard Trust Co. v. Helvering,* 301 U.S. 540, 543–44, 57 S.Ct. 855, 81 L.Ed. 1272 (1937). The mandamus remedy is available only under exceptional circumstances of clear illegality. As stated recently by the D.C. Circuit:

> When the performance of official duty calls for a construction of governing law, the [federal] officer's interpretation will not be disturbed by a writ of mandamus unless it is clearly wrong and his official action is arbitrary and capricious. *Asso-*

---

**8.** Affidavits by the Government indicate that appellant has received at least as much money indirectly through Part A reimbursement as he would have received under Part B reimbursement. Add. B & C to Appellee's Br. However, if any damages were in fact incurred by Dr. Cervoni, jurisdiction for claims of damages only might rest in the Court of Claims. *See South Windsor Convalescent Homes, Inc. v. Mathews,* 541 F.2d 910 (2d Cir. 1976). In *Overlook Nursing Home, Inc. v. United States,* 556 F.2d 500 (Ct.Cl.1977), the Court of Claims reaf-

firmed *Whitecliff Inc. v. United States,* 536 F.2d 347, 210 Ct.Cl. 53 (1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977) where the court found jurisdiction over a provider's reimbursement claim. In *Dr. John T. MacDonald Foundation, supra,* the Fifth Circuit transferred to the Court of Claims a case involving a hospital's claim for reimbursement under the Medicare Act. We express no opinion whether the Court of Claims could or would assert jurisdiction over this claim.

*ciation of American Medical Colleges v. Califano, supra,* 186 U.S.App.D.C. at 279, 569 F.2d at 110 n.80.

The Secretary's determination involved the interpretation of the distinction between Part A and Part B claims. The Secretary does not have a clearly defined and peremptory duty to allow Dr. Cervoni to receive reimbursement under Part B. The decision was in no way arbitrary or capricious. Rather, the classification of Dr. Cervoni's services involved a close examination of Dr. Cervoni's duties, after a thorough investigation including discussions with Dr. Cervoni and employees of the hospitals. Further, Dr. Cervoni may adequately protect such interests as he has under the Act as outlined above *supra* at p. 1018, without using mandamus.

## IV. CONCLUSION

The district court was correct in determining that no subject matter jurisdiction existed in the absence of a colorable constitutional claim. After a full hearing, the court determined that no such constitutional claims existed, and our analysis is in agreement. The decision of the district court is *affirmed.*