**Dr. Walter CERVONI, Plaintiff,**

v.

**Louis V. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.**

**Civ. No. 88–1588 (JAF).**

United States District Court, D. Puerto Rico.

May 3, 1991.

Eduardo Morales–Coll, San Juan, P.R., for plaintiff.

José Vázquez–García, Asst. U.S. Atty., Daniel F. López–Romo, U.S. Atty., D.P.R., San Juan, P.R., for defendant.

## OPINION AND ORDER

FUSTE, District Judge.

Dr. Walter Cervoni, a pathologist, seeks to recover reimbursement from the Medicare program for certain services rendered to Medicare eligible patients between July 1, 1973 and June 30, 1980. The defendant, the Secretary of Health and Human Services (the "Secretary") takes the position that Dr. Cervoni was already compensated for his work since the salary he received at the hospitals where he performed the services included payment for his time spent with Medicare patients, and that the proper recipients of Medicare program reimbursement for Dr. Cervoni's services would be the hospitals where he worked. That, however, is a summary of the merits of the case. The issues which must occupy us are more mundane. Since the beginning of this dispute, procedural factors have been at center stage, and it is on a procedural point that the matter must be dismissed. We find today that plaintiff failed to timely pursue his administrative remedies, and that his case died in the administrative stage prior to hearing. We have no jurisdiction to review the merits. We will also discuss a statutory bar, written into the statute at issue, that severely limits judicial review of claims in this area. We find that the judicial review bar does not limit our ability to review the Secretary's determination that the plaintiff's untimeliness during the administrative process terminated his claim. Although a default judgment was entered against the government, we now dismiss the entire matter.

### Federal Legislation and Regulations

The Medicare Program, set out in Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395ccc, is divided into two parts. Part A provides hospital insurance benefits to the elderly and disabled. 42 U.S.C. §§ 1395c–1395i-2. The hospital fees are paid directly by the government to the providing hospital. 42 U.S.C. § 1395i.

Part B is a federally-subsidized, voluntary insurance program that pays a portion, usually 80%, of the cost of certain medical procedures not covered by Part A. It is for persons 65 or older, and eligibility does not depend on financial need. 42 U.S.C. §§ 1395j–1395w. *United States v. Erika, Inc.*, 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982). Participants in the Part B program pay a monthly premium in order to be covered. 42 U.S.C. §§ 1395r. The beneficiaries (the patients) have the option of assigning their right to reimbursement to the medical provider. § 1395u(b)(3)(B)(ii).

The administration of Part B is not actually handled by the Secretary directly. Instead, the Secretary has exercised the option of delegating the administration to insurance carriers, who have expertise in the administration of insurance programs. 42 U.S.C. § 1395u; *See* H.R.Rep. No. 213, 89th Cong., 1st Sess., 46 (1965), 1965 U.S. Code Cong. & Admin.News at 1943). The carrier is authorized to set rates, review claims, and make payments out of the fund. The carrier charges the Secretary an administrative fee for processing the claims. 42 U.S.C. § 1395u(b)(3)(C). The carrier is required to provide a full administrative adjudication process including several stages of review culminating in a hearing before a hearing officer designated by

the carrier. 42 U.S.C. § 1395u(b)(3)(C);[1] 42 C.F.R. § 405.801–872.[2] In pursuing a claim, a physician with an assignment from a claimant is required to comply with filing deadlines at several steps in the process. 42 C.F.R. §§ 405.807–820. The hearing officer's decision under the law applicable to this case is "final and binding upon all parties to the hearing...." 42 U.S.C. § 1395ff; 42 C.F.R. § 405.835.[3]

### Facts

In the 1960's Dr. Cervoni, a pathologist, contracted with Doctor's Hospital and Hospital Auxilio Mutuo to provide clinical laboratory services. For several years after the beginning of the Medicare program, Dr. Cervoni both received his hospital salary and was able to bill Medicare, under Part B of the program, for the lab work that he performed for Medicare patients. It was then and is now Dr. Cervoni's contention that the salary at the hospitals was for administrative work only, and that it contemplated that he himself would be able to bill patients separately for lab work that he performed on individual cases. According to Dr. Cervoni, then, the advent of

Medicare did not change that arrangement. He would bill ron-Medicare patients directly, and Medicare patients through Part B of the program.

In the early '70's, the Secretary determined that the services for which Dr. Cervoni had been billing were properly seen as "hospital" services since they did not contain "direct physician services," and that therefore they should be billed by the hospital itself. According to the Secretary, Dr. Cervoni's salary at the hospital did include payment for the work performed by him, and if not, then Dr. Cervoni could renegotiate his contract to reflect the fact that the hospital would be able to bill for services performed by him, and then compensate him directly.[4] Although Dr. Cervoni continued to submit Part B claims, the Secretary denied them. The last payments were issued for services performed through June 30, 1973.[5]

In 1975, Dr. Cervoni came to this court to seek the back payments. The district court dismissed for lack of subject matter jurisdiction, and the circuit affirmed. *Cervoni*

1. This section now provides that the fair hearing by the carrier need be provided "in any case where the amount in controversy is at *least $100, but less than $500* ...." At the time relevant to plaintiff, there was no $500 cap on the amount in controversy for which the carrier had to provide the hearing.

2. We will refer throughout the decision to current C.F.R. references. Several sections have been transferred since the dispute arose. Research has shown that no substantive changes have occurred in the sections relevant to our discussion.

3. A 1986 amendment to § 1395ff permits judicial review of certain Part B amount determinations, but the amendment only applies to claims for Medicare services furnished after January 1, 1987.

4. *Cervoni v. Secretary of Health, Education & Welfare*, 581 F.2d 1010, 1013 (1st Cir.1978).

5. Dr. Cervoni was informed as early as 1969 that his services should be billed by the hospital under Part A of the program rather than by himself under Part B. *Cervoni*, 581 F.2d at 1013, n. 4. By 1973 he had already engaged in skirmishes with the Secretary regarding his right to continue billing under Part B of the program, and was by that time well aware that

his position was tenuous. By June of 1974, after approximately one year's worth of bills submitted by Cervoni under Part B had been rejected, the carrier wrote to Cervoni stating that:

> [i]f you consider that you will not be receiving reimbursement for services rendered to medicare patients you should discuss with the provider [the hospitals] a new agreement to include in your compensation the services rendered to medicare patients.

*Cervoni*, 581 F.2d at 1013. In other words, if it was true that the hospital contracts included no compensation for Medicare work, Cervoni could at any moment have renegotiated those contracts with the hospitals to include such compensation. The First Circuit reminded Cervoni of that option again in 1978. *Cervoni*, 581 F.2d at 1018. Since it is unchallenged that the hospitals could have been reimbursed under Part A of the program, it would seem that Cervoni could have obtained his rightful compensation through them. If he had renegotiated his contracts in 1973, this dispute would never have arisen. We think it curious that the doctor provided services for seven years for allegedly no compensation, at a time when his employers did or could have billed for his services, and yet he never renegotiated his contracts to reflect that situation.

*v. Secretary of Health, Education and Welfare*, 581 F.2d 1010 (1st Cir.1978). As framed by the circuit, Cervoni sought review on the merits of the question as to whether his laboratory services should have been classified as properly falling into Part A or Part B. The court characterized the Secretary's action as a denial of benefits under Part B. As such, according to the court, Cervoni could not invoke judicial review because the Medicare statute specifically precluded such review. *Cervoni*, 581 F.2d at 1015.[6] The *Cervoni* court opined that such review might be allowed for a plaintiff who attacked the constitutionality of the statute or regulations, but that Cervoni had not stated a valid claim under the Constitution. The court examined and rejected several other potential jurisdictional grounds and, finding none, dismissed the matter.

Cervoni's claim, dead after the decision in *Cervoni* in 1977, breathed new life in 1980. In *Arkansas Society of Pathologists v. Harris*, Medicare & Medicaid Guide (CCH) ¶ 30,546 (E.D.Ark. Nov. 20, 1980), the court issued an injunction barring the Secretary from denying reimbursement under Part B for the "professional component" of clinical pathology services in any case where the pathologist had applied for reimbursement before June 5, 1980. The Secretary published a notice in the Federal Register announcing that the injunction would be complied with nationally. 45 F.R. 80827 (Dec. 8, 1980).

On August 31, 1981, Theodore Shulman, of the Health Care Financing Administration ("HCFA", a branch of HHS, and therefore a delegate of the Secretary), wrote to Eduardo Morales, Dr. Cervoni's attorney, to inform him of the change in policy, and to solicit any information which Dr. Cervoni might supply which would prove that the salary paid at the hospitals did not already include compensation for the professional component of laboratory pathology services. Attached to Shulman's letter was an internal agency memorandum which stated that:

Regarding any claims for services prior to January 1, 1980 ... Dr. Cervoni was compensated for these services by the hospital and the hospital billed this compensation to Medicare. Dr. Cervoni has not submitted any materials which are adequate to demonstrate that payments under this contract were not for his services in connection with clinical laboratory procedures to Medicare patients. Given these facts, we believe that Medicare Part A has already paid for these services. Paying for them again under Part B would not be justified.

If Dr. Cervoni established through adequate documentation that his actual understanding with the hospital was that the compensation reported in the cost report and received by Dr. Cervoni was not for the so-called professional component of clinical laboratory procedures to Medicare patients, or to patients generally, we would give further consideration to the pre–1980 period.

The memo then went on to explain exactly what type of documentation the doctor would have to submit in order to make his claim.

The next action taken by anyone in this case was the reply by Cervoni's attorney, who wrote to Shulman on September 17, 1984, *fully three years* after the 1981 letter and memo. The attorney wrote that "[b]ecause of the disastrous effects the new regulations have had on Dr. Cervoni's practice, *my client has decided to press the issue of payment for his services from 1972 to 1980.*" The letter supplies none of the documentation sought in 1981. It is clear from the letter that Cervoni had no excuse for failing to respond for three years, except that he had decided to abandon his claim. Only when the new regulations proved to be hurting his income did he decide to seek the back payments.

▆ Defendants argue, and we agree, that this three-year delay was a gross violation of the time limitations written into the regulations, amounts to a failure to exhaust administrative remedies, and ulti-

---

**6.** We will revisit this bar to judicial review later in the opinion with respect to the current claim.

mately must prove fatal to Cervoni's claim of federal court jurisdiction.

The regulations provide for a three-step administrative process. Under ordinary circumstances, the process begins with the physician filing a claim with the carrier (the insurance company with whom the Secretary has contracted to administer the program in a given geographic area; in Puerto Rico Seguros de Servicios de Salud, "SSS"). The filing ordinarily must take place on or before December 31 of the calendar year following the year in which the services were furnished. Services furnished in the last quarter of a year are considered furnished in the following year. 42 C.F.R. § 424.44–424.45 [Referred to in correspondence between Shulman and Cervoni's attorney as 42 C.F.R. § 405.1692(a), the section applicable at that time].

An initial determination must then be made, which:

> includes among others, a determination as to whether items and services furnished are covered; whether the deductible has been met; whether the receipted bill or other evidence of payment is acceptable; whether the charges for items or services furnished are reasonable; ... whether such enrollee, physician, or supplier knows or could reasonably have been expected to know that such items or services were excluded from coverage.

42 C.F.R. § 405.803.

■ We identify the letter and memorandum sent in August of 1981 as an "initial determination." An initial determination, as described above, is designed to be a first impression decision on eligibility. It may include a finding that certain evidence is insufficient, or it may be based on any other factor which tends to indicate that the claim should not be paid. The fact that the letter and memo seek more information do not take them out of the purview of an initial determination. Nor do we not see the fact that the letter came from the HCFA rather than the carrier directly makes any difference. Since this was a complicated case, considering the intervening event of a nationwide injunction, it was natural that the HCFA would step into the shoes of its delegate, the carrier, for purposes of making the initial determination and thereby helping to define the issues. It is obvious from the text of the memorandum that the Secretary had determined that Dr. Cervoni did not have a claim, a decision that could only be changed by the submission of new evidence. In that sense, it was surely a "determination" of the claim.

Since we consider the August 31, 1981 mailing to be the initial determination, and since we know that Dr. Cervoni was dissatisfied with it, the next required step was to request a "review" (on paper) within six months of the initial determination. 42 C.F.R. § 405.807. Dr. Cervoni was under an obligation to file a request for review, along with the requested additional information, within six months of August 31, 1981. Instead, he did not reply for over three years. We find that his claim, if he had one, perished in that time period.[7] Had the review proceeded, and had the claim been denied, Cervoni then would have had the opportunity for a hearing.

Following the belated response, another volley of letters went back and forth between the parties. Finally, in an October 3, 1986 letter from the carrier, the carrier informed Cervoni, through his attorney, that the three-year delay rendered his claim untimely.[8] Since Cervoni failed to exhaust

---

**7.** We note that an "initial determination" notice to the claimant is supposed to contain a statement that review is allowed. 42 C.F.R. § 405.804. The initial determination here contained no advisement. We are sure, however, that Dr. Cervoni's attorney was aware that review of an adverse agency decision is generally available. Such knowledge can be imputed from the fact that he did file a review request in 1984.

**8.** The carrier's and HFCA's reasoning for untimeliness is slightly different than ours. They consider that the 1981 letter and memo constituted the date of a new "claim". Therefore, all services performed before that date could still be submitted, along with the documentation requested in the 1981 mailing, just as if the services had actually been provided on August 31, 1981. A claim for any "service performed" on August 31, 1981 would have to have been filed on or before December 31, 1982 (the last day of

his administrative remedies, he cannot state a cause of action for federal relief. Cervoni's claim is that the Secretary made an erroneous determination as to his entitlement to benefits under Part B of the Act. Assuming that any judicial review of that question would exist at all (see discussion below) the only avenue for such review, as provided in 42 U.S.C. § 1395ff, is through 42 U.S.C. § 405(g). *Heckler v. Ringer*, 466 U.S. 602, 617, 104 S.Ct. 2013, 2023, 80 L.Ed.2d 622 (1984). Jurisdiction through § 405(g) is the only possible jurisdictional basis, to the exclusion of 28 U.S.C. § 1331, for all "claim[s] arising under" the Medicare Act. *Id.; Weinberger v. Salfi*, 422 U.S. 749, 760–61, 95 S.Ct. 2457, 2464–65, 45 L.Ed.2d 522 (1975). The Act itself specifically provides that "[n]o action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter." 42 U.S.C. § 405(h). Since this is an individual claim for benefits, and not properly a broadside constitutional attack, this matter arises under the Act, and cannot have a jurisdictional basis which is not subject to an exhaustion requirement. *Ringer*, 466 U.S. at 615, 104 S.Ct. at 2021; *Salfi*, 422 U.S. at 760–61, 95 S.Ct. at 2464–65. The claim foundered in the administrative process, and the plaintiff cannot invoke our jurisdiction to hear the merits.

### Judicial Review Bar

█ Although we dismiss the case for the reasons stated above, we feel constrained to respond to defendant's primary argument, that we have no jurisdiction to engage in any review of this matter whatsoever, due to the statutory bar to judicial review written into the statute. It is incumbent upon us to deal with this question since it implicates the very power of this court to engage in the review of the timeliness issue as set out above.

The applicable statute reads as follows:

The determination of whether an individual is entitled to benefits under part A or part B of this subchapter, and the determination of the amount of benefits under part A of this subchapter, shall be made by the Secretary in accordance with regulations prescribed by him.

The statute provides for judicial review of the decision taken by the Secretary in these matters. 42 U.S.C. § 1395ff(b)(1)(C).

Determinations of the *amount* of Part B benefits, on the other hand, are subject to a "fair hearing by the carrier, in any case where the amount in controversy is $100 or more...." 42 U.S.C. § 1395u(b)(3)(C),[9] but the statute provides for no judicial review.

The Supreme Court held in *United States v. Erika Inc.*, 456 U.S. at 207, 102 S.Ct. at 1654, that in omitting a provision for judicial review of the Part B carrier hearings, Congress intended to foreclose review of those determinations. In *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), the Court revisited this area, examined the legislative history surrounding the review provisions of the law, and concluded that indeed Congress intentionally left the determination of the *amount* of benefits under Part B to the carrier, not subject to review.

Defendants urge, then, that since the determination taken here is essentially a determination that Cervoni is entitled to zero benefits, it is merely a Part B amount

---

the year following the year in which the services were provided), 42 C.F.R. § 424.44–45. Therefore, Cervoni's failure to respond for three years meant that he had never filed a timely claim in the first place. Since Cervoni obviously filed at least some of these claims in the years in which he rendered the services, and given that the 1981 letter and memo do not specifically call for a full "resubmission" of the claims (but only for a submission of the extra material regarding his compensation by the hospitals), we cannot agree with defendant's reasons for finding Cer-

voni's claims time-barred within the administrative system. As our reasoning shows, however, we agree with the result.

**9.** The right to review extends not only to the "individual enrolled under [Part B]," 42 U.S.C. § 1395u(b)(3)(C), but to *suppliers* of Part B services to whom individuals have assigned their claims. 42 C.F.R. § 405.801(a). *United States v. Erika, Inc.*, 456 U.S. 201, 207 n. 7, 102 S.Ct. 1650, 1653 n. 7, 72 L.Ed.2d 12 (1982).

determination, and our jurisdictional inquiry should end there. We disagree.

█ The sole fact that a claimant seeks reimbursement under Part B does not in and of itself trigger the no review provisions of the statute. In *Michigan Academy*, 476 U.S. at 677–78, 106 S.Ct. at 2139–40, the Supreme Court explained the limited nature of the no review provisions. "Careful analysis of the governing statutory provisions and their legislative history thus reveals that Congress intended to bar judicial review only of determinations of the amount of benefits to be awarded under Part B." The Court wrote that "[a]s we found in *Erika*, 456 U.S. at 206, 102 S.Ct. at 1653, Congress has precluded judicial review only 'of adverse hearing officer determinations of the amount of Part B payments.'" *Id.* The *Michigan Academy* Court reviewed the strong presumption of reviewability that permeates our jurisprudence, finally concluding that:

> [t]hose matters which Congress did *not* leave to the carrier—including challenges to the validity of the Secretary's instructions and regulations—are not impliedly insulated from judicial review by 42 U.S.C. § 1395ff.

*Michigan*, 476 U.S. at 678, 106 S.Ct. at 2140 (emphasis in original). *See Kuritzky v. Blue Shield of Western New York, Inc.*, 850 F.2d 126 (2nd Cir.1988), *cert. denied*, 488 U.S. 1006, 109 S.Ct. 787, 102 L.Ed.2d 778 (1989) (mere challenge to determination after fair hearing of computation methods held not reviewable); *American Ambulance Service v. Sullivan*, 911 F.2d 901 (3rd Cir.1990). The First Circuit has also emphasized that non-reviewability should not be unduly expanded. *McCuin v. Secretary of Health and Human Services*, 817 F.2d 161 (1st Cir.1987).

We interpret *Michigan Academy* to confine the nonreviewability provision to those matters which concern the amount of Part B benefits as determined by the hearing officer at a hearing. This case fails to fall within that definition for three reasons. First, the case never got to the hearing stage. Second, the merits of the case do not concern the *amount* of benefits due or

not due to Dr. Cervoni, they concern whether he is eligible under Part B of the program at all (or whether, instead, the services have already been paid under Part A reimbursement). Third, what we reviewed today was not the merits in any event, but the Secretary's determination that the administrative timetable had not been complied with. Therefore, we find that the non-reviewability bar in the statute does not apply.

### Conclusion

This matter is DISMISSED in its entirety, since the plaintiff failed to exhaust his administrative remedies.

IT IS SO ORDERED.